**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| _____ ) | |
| **ADIRONDACK MEDICAL CENTER,** *et* ) | |
| *al.*, ) | |
| ) | |
| **Plaintiffs,** ) | |
| ) | |
| v. ) | **Civil Action No. 11-313 (RMC)** |
| ) | |
| **KATHLEEN SEBELIUS, Secretary,** ) | |
| **Department of Health and Human** ) | |
| **Services,** ) | |
| ) | |
| **Defendant.** ) | |
| _____ ) | |

**OPINION**

Plaintiff Hospitals[1] sue Kathleen Sebelius, Secretary of Health and Human

Services, challenging her application of certain adjustments to Medicare reimbursement rates for

---

[1] Plaintiffs are: Adirondack Medical Center, Agnesian Healthcare, Inc., Albemarle Hospital
Authority, Augusta Health Care, Inc., Bates County Memorial Hospital, Benefis Hospitals, Inc.,
Blessing Hospital, Bothwell Regional Health Center, Cape Cod Healthcare, Inc., CarolinaEast
Medical Center, Carson Tahoe Regional Healthcare, CGH Medical Center, Champlain Valley
Physicians Hospital, Chesapeake Hospital Corporation, Clallam County Public Hospital District
2, Clearfield Hospital, Community Memorial Healthcenter, Cortland Regional Medical Center,
Inc., Golden Valley Memorial Hospital District, Graham Hospital Association, Grenada Lake
Medical Center, Holy Rosary Healthcare, IHC Health Services Inc., Joint Township District
Memorial Hospital, Lake Regional Health System, Lawrence Memorial Hospital,
LRGHealthcare, Mary Lanning Memorial Hospital, McAlester Regional Health Center
Authority, McDonough County Hospital District, Memorial Hospital of Sheridan County,
Memorial Medical Center of West Michigan, Mid-Columbia Medical Center, Munson Medical
Center, Otero County Hospital Association, Otsego Memorial Hospital, Passavant Memorial
Area Hospital Association, Phelps County Regional Medical Center, Promise Regional Medical
Center-Hutchison, Inc., Rapid City Regional Hospital, Inc., Regional West Medical Center, Reid
Hospital & Health Care Services Inc., Rice Memorial Hospital, Salina Regional Health Center,
Inc., Sarah Bush Lincoln Health Center, Sky Lakes Medical Center Inc., Southeastern Regional
Medical Center, Southern Illinois Hospital Services, Southwest Medical Center, Southwestern
Vermont Medical Center Inc., SSM Regional Health Services, St. James Healthcare Inc., St.

sole community hospitals and Medicare-dependent, small rural hospitals.  The Hospitals assert

that the Secretary's actions are both *ultra vires* and arbitrary and capricious in violation of the

Administrative Procedure Act, 5 U.S.C. § 706.  The parties also litigate whether the Secretary

violated the APA by failing to comply with notice and comment rulemaking procedures when

she issued payment instructions affecting sole community hospitals for fiscal year ("FY") 2009

and FY2010.  The Secretary counters that her actions are within her authority and consistent with

the APA.  Before the Court are the parties' cross-motions for summary judgment.  The Court

will grant in part and deny in part the Secretary's motion for summary judgment.  The Court will

grant the Secretary's motion for summary judgment on the issue of whether the Secretary was

required to engage in rulemaking when issuing the second 2008 rebasing instruction for sole

community hospitals and deny Plaintiffs' motion for summary judgment on this issue.  The

Court will deny both the Secretary's and Plaintiffs' motions for summary judgment without

prejudice on the issue of whether the Secretary's application of a cumulative budget neutrality

adjustment for sole community hospitals in FY2009 and FY2010, and for Medicare-dependent,

small rural hospitals in FY2010, violates the APA and order further briefing.

## I.  FACTS

### A.  Background

#### 1.  Inpatient Prospective Payment System

Medicare is a federal health insurance program for the elderly and the disabled.

*See* 42 U.S.C. § 1395 *et seq.*  It is administered by the Centers for Medicare and Medicaid

---

Joseph Regional Medical Center, St. Joseph's Medical Center, St. Luke's Magic Valley
Regional, St. Mary's Hospital & Medical Center Inc., Still Water Medical Center Authority,
Rutland Hospital, Inc., Valley View Hospital Association, Wayne Memorial Hospital Inc.,
Waynesboro Hospital, Western Missouri Medical Center.  They are referred to as Plaintiff
Hospitals or Hospitals.

Services ("CMS"), a division of the Department of Health and Human Services ("HHS"), under

the executive management of Defendant Kathleen Sebelius, Secretary of HHS, who is sued in

her official capacity.

Plaintiff Hospitals provide acute inpatient medical care to residents of small or

rural communities.  Each Hospital has been designated a "sole community hospital" ("SCH") or

a "medicare-dependent, small rural hospital" ("MDH") under Medicare.  *See* 42 U.S.C.

§ 1395ww(d)(5)(D)(iii) (defining sole community hospital); *id.* § 1395ww(d)(5)(G)(iv) (defining

Medicare-dependent, small rural hospital).  Because they are critical to providing hospital

services in remote and rural areas and to the uninsured poor, the Hospitals are covered by special

cost reimbursement protections for services under Medicare.  *Id.* §§ 1395ww(d)(5)(D) &

1395ww(d)(5)(G).

To provide an incentive for all hospitals serving Medicare patients to control

costs, Congress directed the Secretary in 1983 to create an "inpatient prospective payment

system" (IPPS), whereby CMS pays prospectively a fixed payment for each anticipated patient

discharge, depending on anticipated diagnosis, necessary treatment, and the like, as described at

42 U.S.C. § 1395ww(d).  *See Methodist Hosp. of Sacramento v. Shalala*, 38 F.3d 1225, 1226-27

(D.C. Cir. 1994) (describing the transition in 1983 to a prospective payment system for hospitals

reimbursed under Medicare).  The payment rates are set before the fiscal year begins and control

reimbursements for specified services without regard to the actual cost of providing that medical

care to hospitalized Medicare patients.  *Id.*  "Congress designed this system to encourage health

care providers to improve efficiency and reduce operating costs."  *Id.*

IPPS depends, in part, on patient diagnoses.  Diagnoses are assigned to a

"diagnosis-related group" ("DRG"), and each DRG is assigned a weight that is multiplied by a

base dollar amount to determine actual payment.  42 C.F.R. § 412.60(b); *id.* § 412.64(g).  CMS annually identifies hundreds of different DRGs, assigning each "a numeric weight reflecting the amount of resources needed, on average, to treat a patient with the corresponding diagnosis," relative to other diagnoses.  *Florida v. Tenet Healthcare Corp.*, 420 F. Supp. 2d 1288, 1293 (S.D. Fla. 2005); *see* 42 U.S.C. § 1395ww(d)(4)(A)-(B); 42 C.F.R. § 412.60.  The Amici[2] advised that DRG weights range from less than 1 up to 7.  Transcript of Feb. 25, 2013 Hearing [Dkt. 38], 8:1-3.  Starting in fiscal year ("FY") 1988, Congress required the Secretary to adjust DRG weighting factors every year "to reflect changes in treatment patterns, technology . . . , and other factors which may change the relative use of hospital resources."  42 U.S.C. § 1395ww(d)(4)(C)(i).  Starting in FY1991, Congress also required the Secretary to ensure that annual adjustments to DRG weighting factors not result in an overall increase to Medicare spending.  *Id.* § 1395ww(d)(4)(C)(iii).  The law specifies:

> Any such adjustment [to diagnosis-related groups] . . . for discharges in a fiscal year . . . shall be made in a manner that assures that the aggregate payments under this subsection for discharges in the fiscal year are not greater or less than those that would have been made for discharges in the year without such adjustment.

*Id.*  The parties agree that this subsection of Medicare stands for the proposition that other factors might increase the cost of Medicare coverage but the Secretary must ensure that annual changes to DRG weights have a budget-neutral effect.

---

[2] Amici are Knox Community Hospital, Edward John Noble Hospital of Gouverneur, New York (INC), Hanover Hospital, Inc., Hays Medical Center, Inc., Labette County Medical Center, Memorial Hospital of Sweetwater County, Mercy Hospital Lebanon, Mercy Memorial Health Center, Inc., Newman Memorial County Hospital, North Platte Nebraska Hospital Corporation, Northwestern Medical Center Inc., Pocatello Hospital, LLC, and Richmond Memorial Hospital. The Court granted Amici's motion for leave to file a brief and ordered the Secretary to respond. *See* Minute Order, Oct. 31, 2012.

Consequently, in addition to adjusting DRG weights to reflect changes in treatment patterns and technology each year, the Secretary also adjusts new DRG weights so that the average case after the annual adjustment has the same DRG weighting factor as the average case before adjustment.  This normalization, however, does not achieve full budget neutrality in overall payments because the "average" cannot capture the full range of diagnoses and treatments.  *See* FY1991 Proposed Rule, 55 Fed. Reg. 19,426, 19,466 (May 9, 1990) ("While [normalization] is intended to ensure that recalibration does not affect total payments to hospitals, our analysis indicates that the normalization adjustment does not achieve budget neutrality with respect to aggregate payments to hospitals.").  As a result, the Secretary calculates an additional adjustment—a so-called DRG budget neutrality adjustment—to satisfy the congressional directive that changes to DRG weighting factors not be a cause of increases in Medicare costs.  *Id.*  The Secretary insists that she has implemented the budget neutrality adjustment in a cumulative manner since 1994, *i.e.*, the Secretary does not remove the effects of prior years' budget neutrality adjustments when adding the current year's budget neutrality adjustment.  *See* FY1994 Final Rule, 58 Fed. Reg. 46,270, 46,346 (Sept. 1, 1993) ("Th[e] budget neutrality adjustment factor is applied to the standardized amounts without removing the effects of the [prior year's] budget neutrality adjustment.  We do not remove the prior budget neutrality adjustment because the statute requires that aggregate payments after the changes in the DRG relative weights and wage index equal estimated payments prior to the changes.  If we removed the prior year adjustment, we would not be able to satisfy this condition.").  Notably, however, the budget neutrality adjustment—although called a DRG budget neutrality adjustment by the parties—is actually applied by the Secretary to the *payment rate* applicable to the Hospitals and not to the *DRG weights* themselves.  *See, e.g.*, FY1994 Proposed Rule, 58 Fed. Reg. 30,222,

30,269 (May 26, 1993) ("In addition, we are proposing to continue to apply the same FY1994

[budget neutrality] adjustment factor to the hospital-specific rates . . . to ensure that we meet the

statutory requirement that aggregate payments neither increase nor decrease as a result of the

implementation of the DRG weights and updated wage index.").

### 2. Methodology for Calculating Payment Rates for SCHs and MDHs

Most hospitals are paid according to what the regulations call the "federal rate"

for each Medicare beneficiary.[3]  *See* 42 C.F.R. § 412.64.  The starting point in calculating the

federal rate in a given year is the "average standardized amount," essentially the average

operating cost per patient discharge for all IPPS hospitals[4] in a given time period, irrespective of

diagnosis.  *See* 42 U.S.C. § 1395ww(d)(3)(A).  The average standardized amount is case-mix

adjusted, which means that the average cost is divided by the average DRG weight for all IPPS

hospitals in the relevant year.  *Id*.; *see also id.* § 1395ww(d)(2)(C).  For a new year, the average

standardized rate of the previous year is updated for inflation, 42 U.S.C. § 1395ww(b)(3)(B), and

multiplied by a budget neutrality adjustment for the new year.  *See, e.g.*, 58 Fed. Reg. 30,269.

To calculate the reimbursement rate for a specific discharged beneficiary, this product is

multiplied by the DRG weighting factor that applies to the diagnosis of the discharged patient.

*See* 42 U.S.C. § 1395ww(d)(3)(D).  The result is the federal rate payment for that diagnosis as of

discharge.  However, in light of the financial burden of addressing the needs of their small-

community or rural-patient populations, the Medicare Act provides a special method for

calculating reimbursement rates for SCHs and MDHs.

---

[3] The statute calls this rate the "national adjusted … payment rate."  42 U.S.C.
§ 1395ww(d)(1)(A)(iii)(I).

[4] "All IPPS hospitals" includes all SCHs and MDHs such as Plaintiffs.

SCHs and MDHs are paid according to the federal rate *or* according to each hospital's distinct "hospital-specific rate," depending on which rate will result in a higher payment.[5]  An MDH is paid the federal rate plus 75% of the difference, if any, between its federal rate payment and its hospital-specific rate payment.  42 U.S.C. § 1395ww(d)(5)(G)(ii)(II); 42 C.F.R. § 412.108.  An SCH receives either the federal rate or its hospital-specific rate, whichever is higher.  42 U.S.C. § 1395ww(d)(5)(D)(i); 42 C.F.R. § 412.92.  The starting point for calculating a hospital-specific rate is the historic average per-patient cost at the specific hospital in a particular base year, as identified by Congress.[6]  *See* 42 C.F.R. § 412.2(c).  The average cost is then case-mix adjusted, which means that the average cost per discharged patient is divided by the average DRG weight for the base year at that particular hospital.  *See, e.g.*, 42 C.F.R. § 412.73(b).  These costs are then updated by a rate-of-increase percentage.[7]  *See, e.g.*, *id.* § 412.73(c).  The result of this formula is the hospital-specific rate.  The hospital-specific rate is further multiplied by the budget neutrality adjustment.  *See id.* § 412.73(d).  To determine payment for a specific patient, this product is multiplied by the DRG weight relevant to that patient's diagnosis.  *See, e.g.*, *id.* § 412.73(e).

### 3.  The Secretary's Rebasing Instructions

In 2006, Congress added FY2002 as a base year for calculating hospital-specific rates for MDHs, effective for cost reporting periods beginning on or after October 1, 2006.  *See* Deficit Reduction Act of 2005, Pub. L. No. 109-171, § 5003(b), 120 Stat. 4 (2006).  In 2008,

---

[5] The statute calls this rate the "target amount."  42 U.S.C. § 1395ww(b)(3), (d)(5)(D)(i)(I), (d)(5)(G).

[6] MDHs may use FY1982, FY1987, and FY2002 as base years. SCHs may use FY1982, FY1987, FY1996, and FY2006 as base years.  *See* 42 C.F.R. § 412.92(d); *id.* § 412.108(c).

[7] This update accounts for inflation.  *See* Notice of Joint Statement [Dkt. 36].

Congress added FY2006 as a new base year for SCHs, effective for cost reporting periods

beginning on or after January 1, 2009.  *See* Medicare Improvements for Patients and Providers

Act of 2008, Pub. L. No. 110-275, § 122, 122 Stat. 2494.

      When Congress adds a new base year, the Secretary provides technical

instructions to fiscal intermediaries[8] on how to calculate new hospital-specific rates.  These are

called "rebasing" instructions.  For example, in 1999, Congress added FY1996 as a new base

year for cost-reporting periods beginning on or after October 1, 2000 for SCHs.  *See* Medicare,

Medicaid, and State Children's Health Insurance Program Balanced Budget Refinement Act of

1999, Pub. L. No. 106-113, § 405, 113 Stat. 1501.  In the summer of 2000, the Secretary issued

rebasing instructions under that law and directed fiscal intermediaries for SCHs to apply

cumulative budget neutrality adjustments from FY1993 to FY2000 for all base years.

Rulemaking Record ("RR") at 1204-08 ("Transmittal A-00-66").

      However, in 2006, when Congress added FY2002 as a base year for MDHs, and

in 2008, when Congress added FY2006 as a base year for SCHs, the Secretary's initial rebasing

instructions did not direct fiscal intermediaries to apply cumulative budget neutrality

adjustments.  Rather, for MDH calculations relying on a base year of FY2002, the Secretary

directed that budget neutrality adjustments be applied only prospectively for years after the base

year, *i.e.*, from FY2003 forward.  RR at 1217 ("Transmittal 1067").  Similar instructions were

issued on October 3, 2008 upon rebasing for SCH payments, directing fiscal intermediaries to

apply budget neutrality adjustments prospectively.  Pls. Mot. for Summ. J. ("Pls. MSJ") [Dkt.

22], Ex. A [Dkt. 22-1] ("Transmittal 1610").  The October 2008 implementation instructions for

SCHs were short-lived.  Six weeks after issuance, on November 17, 2008, the Secretary

---

[8] Fiscal intermediaries, generally private insurance companies that process Medicare claims, are
also known as Medicare administrative contractors.  *See* 42 U.S.C. § 1395h.

rescinded her initial SCH payment instructions and replaced them with instructions for fiscal intermediaries that required application of full cumulative budget neutrality adjustments from FY1993 forward.  RR at 1209-12 ("Joint Signature Memorandum").

The Secretary now contends that "MDHs that received payments based on a FY2002 base year were paid approximately 1.74% more than they would have received if the cumulative DRG adjustments between FY1993 and FY 2002 had been properly applied."  Def. Mot. for Summ. J. ("Def. MSJ") [Dkt. 24] at 14.  She says that CMS discovered an "inadvertent error" in its initial instructions concerning FY2006 as a new base year for SCHs and corrected it almost immediately.  *Id.*  Realizing that the same "inadvertent error" affected payments to MDHs, the Secretary issued a proposed rule for notice and comment to correct the MDH error. *See* FY2010 Proposed Rule, 74 Fed. Reg. 24,080, 24,184-85 (May 22, 2009).  The Secretary issued a Final Rule in FY2010, informing MDHs and fiscal intermediaries that corrected calculations for MDHs, including all cumulative DRG adjustments since FY1993, must be applied as of FY2010.  *See* FY2010 Final Rule, 74 Fed. Reg. 43,754, 43,896 (Aug. 27, 2009).

It is this requirement that full cumulative budget neutrality adjustments be applied to MDH reimbursement rates in FY2010 and SCH reimbursement rates in FY2009 and FY2010 that is at issue here.

The Court directed the Secretary to explain the genesis of this "inadvertent error," inasmuch as CMS is a huge bureaucracy in which any directions to fiscal intermediaries must be reviewed by numerous eyes: was the direction to apply budget neutrality adjustments only after the base years the result of an intentional decision or error?  In response, Tzvi Hefter, Director of the Division of Acute Care (DAC), Hospital and Ambulatory Policy Group, Center for Medicare, CMS, submitted a semi-informative and circular declaration.  Decl. of Tzvi Hefter ("Hefter

Decl.") [Dkt. 40].  The DAC is responsible for the development of payment policies for the

Medicare hospital IPPS.  *See id.* ¶ 1.  Employees in the DAC and the Provider Billing Group,

CMS, worked together, as they had previously, on the rebasing instruction for MDHs in 2006.

Their work was reflected in Transmittal No. 1067.  "The instruction contained an inadvertent

error in that it . . . omitted the incremental DRG budget neutrality adjustments from FY1993

through FY2002."  Hefter Decl. ¶ 7.  Mr. Hefter does not recall who might have prepared

Transmittal No. 1067, but he is sure it resulted from "inadvertent error" because the Secretary

had not changed the policy and such a policy change would have been included in the FY2007

IPPS rulemaking process.  *Id.* ¶ 8.  "In addition, if the individuals preparing Transmittal No.

1067 had intended to implement such a policy change, they would also have changed the

instruction for how to calculate the hospital-specific rate for SCHs based on a FY 1996 base

year," but that did not happen.  *Id.* ¶ 9.  When rebasing was done for SCHs in 2008 after

Congress added FY2006 as a base year, "the individuals preparing the instruction in Transmittal

No. 1610 [for that rebasing] were using Transmittal No. 1067 as a template and thus copied the

same inadvertent error . . . ."  *Id.* ¶ 10.  The error only became known when Mr. Hefter "received

an inquiry by email from a private consultant" causing DAC to recognize the error in both sets of

instructions.  *Id.* ¶ 11.

       The question from the Court was how the alleged "inadvertent error" occurred.

Mr. Hefter declares several times that the error was "inadvertent," as did the Secretary's brief

that prompted the question, but he gives no information on the process of developing the

transmittals, their internal review, or his role as Director of DAC where such policy choices

apparently originate.  *See id.* ¶ 1.  Rather, he states that the error must have been inadvertent

since there was no change to SCH payments in 2006 and no policy change was included in IPPS

rulemaking prior to 2008.  For an agency that is responsible for the expenditure of huge amounts

of money and that complains that MDHs received a windfall, CMS is strangely reluctant to

explain or take ownership of its own error.

### B.  Procedural History

Plaintiff Hospitals sought review before the Provider Reimbursement Review

Board ("PRRB") of the Secretary's final determinations regarding cumulative budget neutrality

adjustments for SCHs in FY2009 and FY2010 and MDHs in FY2010.[9]  *See* 42 U.S.C.

§ 1395oo(a).  Plaintiff Hospitals filed group appeals with PRRB, seeking Expedited Judicial

Review pursuant to 42 U.S.C. § 1395oo(f)(1) and 42 C.F.R. § 405.1842.  PRRB issued two

separate but almost identical opinions.  *See* AR at 146-54 (PRRB decision concerning SCHs);

1500-07 (PRRB decision concerning MDHs).  PRRB decided that it lacked jurisdiction to

address the appeals.  It ruled in the alternative that if it had jurisdiction, it lacked authority to rule

on the underlying legal question and expedited review in court would be appropriate.  AR at 146-

54, 1500-07.  Because the Administrator of CMS declined review within 60 days after PRRB's

decisions, *see* AR at 272, 1492, the matters became ripe for court review.  *See* 42 U.S.C.

§§ 1395oo(f)(1); 42 C.F.R. §§ 405.1875(a)(2), .1877(a)(2), (3).

Plaintiff Hospitals filed suit on February 7, 2011.  The Secretary moved to

dismiss and remand, arguing that the case was not ready for judicial review because PRRB had

ruled improperly that it did not have jurisdiction and had not issued a final decision on the

merits.  *See* Def. Mot. to Dismiss [Dkt. 8].  This Court denied the Secretary's motion, noting that

_____

[9] PRRB issued two decisions.  The first, PRRB Case Nos. 09-1872G and 09-2214GC, concerned
SCHs challenging their notices of rebasing for FY2009 and FY2010.  *See* Administrative Record
("AR") at 146-54.  The second decision, PRRB Case No. 10-0663G, concerned MDHs
challenging the FY2010 Final Rule.  *See* AR 1500-07.  Each Plaintiff was a party to one of these
three decisions.

PRRB had ruled in the alternative that expedited review was appropriate and that the failure of

the CMS Administrator to take any action within 60 days rendered PRRB's decisions final

agency actions.  *See* Mem. Op. [Dkt. 13] at 4.  The parties then filed cross-motions for summary

judgment, which are now ripe.[10]

## II.  LEGAL STANDARDS[11]

### A.  Summary Judgment

Under Rule 56 of the Federal Rules of Civil Procedure, summary judgment shall

be granted "if the movant shows that there is no genuine dispute as to any material fact and the

movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *accord Anderson v.*

*Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986).  "In a case involving review of a final agency

action under the Administrative Procedure Act, 5 U.S.C. § 706, however, the standard set forth

in Rule 56[ ] does not apply because of the limited role of a court in reviewing the administrative

record."  *Sierra Club v. Mainella*, 459 F. Supp. 2d 76, 89 (D.D.C. 2006); *see also Charter*

*Operators of Alaska v. Blank*, 844 F. Supp. 2d 122, 126–27 (D.D.C. 2012); *Buckingham v.*

*Mabus*, 772 F. Supp. 2d 295, 300 (D.D.C. 2011).  Under the APA, the agency's role is to resolve

factual issues to reach a decision supported by the administrative record, while "the function of

the district court is to determine whether or not as a matter of law the evidence in the

administrative record permitted the agency to make the decision it did."  *Sierra Club*, 459 F.

Supp. 2d at 90 (quoting *Occidental Eng'g. Co. v. INS*, 753 F.2d 766, 769 (9th Cir. 1985)

(internal quotation marks omitted)).  "Summary judgment thus serves as the mechanism for

---

[10] Plaintiffs' Motion for Leave to Reply to Defendant's Response to Plaintiffs' Summary, Dkt., 41, is granted.

[11] The Court has federal question jurisdiction over Plaintiffs' claims as they arise under federal law—the APA, 5 U.S.C. § 706, and the Medicare Act, 42 U.S.C. § 1395 *et seq*.  *See* 28 U.S.C. § 1331.  Venue is proper pursuant to 42 U.S.C. § 1395oo(f)(1) and 28 U.S.C. § 1391(e)(1).

deciding, as a matter of law, whether the agency action is supported by the administrative record and otherwise consistent with the APA standard of review." *Id.* (citing *Richards v. INS*, 554 F. 2d 1173, 1177 & n. 28 (D.C. Cir. 1977)).

## B.  APA Review

### 1.  5 U.S.C. § 706

Plaintiff Hospitals allege that the Secretary has acted "in excess of her statutory jurisdiction, authority and limitations" in violation of 5 U.S.C. § 706(2)(C) of the APA when calculating the FY2009 and FY2010 reimbursement rates for SCHs and MDHs to include prior years' cumulative budget neutrality adjustments. Compl. ¶ 29.  Their argument is based on basic premises of administrative law: "[A]n agency's power is no greater than that delegated to it by Congress." *Lyng v. Payne*, 476 U.S. 926, 937 (1986); *see also Transohio Sav. Bank v. Dir., Office of Thrift Supervision*, 967 F.2d 598, 621 (D.C. Cir. 1992).  Agency actions beyond delegated authority are *ultra vires* and should be invalidated.  *Transohio*, 967 F.2d at 621.  A court looks to the agency's enabling statute and subsequent legislation to determine whether the agency has acted within the bounds of its authority.  *Univ. of D.C. Faculty Ass'n/NEA v. D.C. Fin. Responsibility & Mgmt. Assistance Auth.*, 163 F.3d 616, 620-21 (D.C. Cir. 1998).

Plaintiff Hospitals also assert the Secretary's calculations of the FY2009 and FY2010 reimbursement rates for MDHs and SCHs were arbitrary, capricious, and not in accord with the law in violation of § 706(2)(A) of the APA.  *See Tourus Records, Inc. v. DEA*, 259 F.3d 731, 736 (D.C. Cir. 2001).  The basic legal tenets here are also longstanding and clear:  A reviewing court "must consider whether the [agency's] decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment." *Marsh v. Or. Natural Res. Council*, 490 U.S. 360, 378 (1989) (internal quotation marks omitted).  At a minimum, the

agency must have considered relevant data and articulated an explanation establishing a "rational connection between the facts found and the choice made." *Bowen v. Am. Hosp. Ass'n*, 476 U.S. 610, 626 (1986) (internal quotation marks omitted); *see also Pub. Citizen, Inc. v. FAA*, 988 F.2d 186, 197 (D.C. Cir. 1993) ("The requirement that agency action not be arbitrary or capricious includes a requirement that the agency adequately explain its result.").  An agency action is arbitrary or capricious

> if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).  "[T]he scope of review under the 'arbitrary and capricious' standard is narrow and a court is not to substitute its judgment for that of the agency."  *Id.*  Rather, agency action is normally "entitled to a presumption of regularity."  *Citizens to Pres. Overton Park, Inc. v. Volpe*, 401 U.S. 402, 415 (1971), *abrogated on other grounds by Califano v. Sanders*, 430 U.S. 99 (1977).

### 2.  5 U.S.C. § 553

Plaintiff Hospitals also claim that the Secretary violated the notice and comment requirements of the APA and the Medicare Act, 42 U.S.C. § 1395 *et seq.*, when she amended the instructions in 2008 for implementing FY2006 as a new base year for SCHs without formal rulemaking.  *See* 5 U.S.C. § 553(b) & (c) (requiring notice and public comment); *see also* 42 U.S.C. § 1395hh(b) (requiring notice and comment when the Secretary engages in substantive Medicare rulemaking).  The law and case precedent distinguish substantive rules from interpretive rules.  "[S]ubstantive rules are those which grant rights, impose obligations, or effect

a change in existing policy [while] interpretive rules are those that merely clarify or explain existing laws or regulations." *Nat'l Med. Enters, Inc. v. Shalala*, 43 F.3d 691, 697 (D.C. Cir. 1995) (citing *Am. Hosp. Assoc. v. Bowen*, 834 F.2d 1037, 1045 (D.C. Cir. 1987)).  Interpretive rules are exempt from notice and comment requirements. *See* 5 U.S.C. § 553(b); *see also Monmouth Med. Ctr. v. Thompson*, 257 F.3d 807, 814 (D.C. Cir. 2001) (concluding that the Medicare Act's reference to "interpretive rules" in 42 U.S.C. § 1395hh(c) "adopted an exemption at least *similar* in scope to that of the APA").

Labeling a rule "interpretive" is not always the end of the question. "Characterization as an interpretive rule does not relieve the Secretary of notice and comment requirements when a valid interpretation [already] exists." *Thompson*, 257 F.3d at 814.  "Once an agency gives its regulation an interpretation, it can only change that interpretation as it would formally modify the regulation itself: through the process of notice and comment rulemaking." *Paralyzed Veterans of Am. v. D.C. Arena L.P.*, 117 F.3d 579, 586 (D.C. Cir. 1997).  "When an agency has given its regulation a definitive interpretation, and later significantly revises that interpretation, the agency has in effect amended its rule, something it may not accomplish without notice and comment." *Alaska Prof'l Hunters Assoc., Inc. v. FAA*, 177 F.3d 1030, 1034 (D.C. Cir. 1999).  The parties contest whether the initial instructions in 2008 for implementation of FY2006 as a base year for SCHs, which expressly directed application of budget neutrality only prospectively, constituted a valid interpretation that could only be changed with formal rulemaking, in the same way that the Secretary handled the "inadvertent error" in payments to MDHs.

# III.  ANALYSIS

Plaintiff Hospitals present two distinct challenges.  First, they attack the

Secretary's reliance on cumulative budget neutrality adjustments, based on the premise that the

Secretary's math is wrong.  Second, they attack the Secretary's failure to engage in formal

rulemaking before rescinding the rebasing instructions for SCHs to fiscal intermediaries in 2008.

These points will be addressed in turn.

## A.  The Secretary's Reliance on Cumulative Budget Neutrality Adjustments

Plaintiff Hospitals allege that the Secretary violated the statutory budget neutrality

requirement when she calculated the reimbursement rates for SCHs using FY2006 as the base

year in FY2009 and FY2010 and for MDHs using FY2002 as the base year in FY2010 by using

cumulative adjustments starting with FY1993.  They contend that "[t]he application of historic

budget neutrality factors results in payments that are *less than* those that would have been made

without such adjustment in violation of the statute."  Compl. ¶ 18.  As a result, Plaintiff Hospitals

claim that the Secretary acted arbitrarily and capriciously, "not in accordance with law," and "in

excess of her statutory jurisdiction, authority and limitations" in violation of 5 U.S.C.

§ 706(2)(A) and (C).  Compl. ¶¶ 29, 33.  The Secretary responds that her rebasing requirements

for SCHs in FY2009 and FY2010 and MDHs in FY2010 comported with all statutory

requirements and with her longstanding methodology for such calculations.

The Medicare Act requires the Secretary to "assure[] that the aggregate payments

under this subsection [adjusting DRGs annually] for discharges in the fiscal year are not greater

or less than those that would have been made for discharges in the year without such

adjustment."  42 U.S.C. § 1395ww(d)(4)(C)(iii).  To reach budget neutrality, the Secretary

applies a cumulative budget neutrality adjustment to the reimbursement rates paid to all IPPS

hospitals.  For those hospitals paid under the federal rate, the budget neutrality adjustment from prior years is already factored into the calculations for the federal rate in the payment year because the starting point for calculating the federal rate is the standardized rate from the prior year.  *See* 42 U.S.C. § 1395ww(d)(3)(A).  Thus, the federal rate calculation necessarily includes all prior years' budget neutrality adjustments.  In contrast, the starting point for calculating the hospital-specific rate for MDHs and SCHs is the average cost per-patient-discharge at each hospital in the base year.  *See* 42 C.F.R. § 412.2(c).  The average cost per patient is divided by the average DRG weight at that hospital in the base year and then adjusted for inflation.  *See, e.g.*, *id.* 412.73(b), (c).  This computation results in a hospital-specific rate without a budget neutrality adjustment.  A hospital-specific rate is multiplied by the budget neutrality adjustment and the product of that calculation is multiplied by the DRG weight pertinent to a specific patient upon discharge to yield the payment rate for that patient.  *See, e.g.*, *id.* § 412.73(d), (e).  The Secretary argues that an historic budget neutrality adjustment is required by the statute and is properly applied to hospital-specific rates for MDHs and SCHs prior to determining reimbursement for discharged patients.

The Secretary relies on her previous practice of applying cumulative budget neutrality adjustments to both MDHs and SCHs to support her current policy.  Starting in FY1991, the Secretary implemented a statutory budget neutrality adjustment in the calculations for all IPPS hospitals, including MDHs and SCHs.  *See* FY1991 Final Rule, 55 Fed. Reg. 35,990, 36,074 (Sept. 4, 1990) ("We applied this budget neutrality adjustment factor to the proposed standardized amounts . . . In addition, we are applying the same adjustment factor *to the hospital-specific rates* that are effective for cost reporting periods beginning on or after October 1, 1990." (emphasis added)).  Starting in FY1994, the Secretary applied a budget neutrality adjustment in a

cumulative manner, including to MDHs and SCHs.  *See* FY1994 Final Rule, 58 Fed. Reg.

46,270, 46,346 (Sept. 1, 1993) ("This budget neutrality adjustment factor is applied to the

standardized amounts without removing the effects of the FY 1993 budget neutrality adjustment.

We do not remove the prior budget neutrality adjustment because the statute requires that

aggregate payments after the changes in the DRG relative weights and wage index equal

estimated payments prior to the changes.  If removed the prior year adjustment, we would not

be able to satisfy this condition.  In addition, we are continuing to apply the same FY 1994

adjustment factor *to the hospital-specific rates* that are effective October 1, 1993, in order to

ensure that we meet the statutory requirement that aggregate payments neither increase nor

decrease as a result of implementation of the DRG weights and updated wage index." (emphasis

added)); *see also* FY2006 Final Rule, 70 Fed. Reg. 47,278, 47,429 (Aug. 12, 2005) ("Beginning

in FY 1994, in applying the current year's budget neutrality adjustment factor *to both the*

*standard Federal rate and hospital-specific rates*, we do not remove the prior years' budget

neutrality adjustment factors because estimated aggregate payments after the changes in the

DRG relative weights and wage index factors must equal estimated aggregate payments prior to

the changes. If we removed the prior year adjustment, we would not satisfy this condition."

(emphasis added)).  Consistent with this policy, the 2000 rebasing instructions for SCHs directed

intermediaries to apply cumulative DRG budget neutrality adjustment factors from FY1993 to

FY2000.  *See* Transmittal A-00-66.

> Plaintiff Hospitals contend that the Secretary "botches the math, resulting in

payments to hospitals that are less than they should be" for SCHs in FY2009 and FY2010 and

MDHs in FY2010.  Pl. MSJ at 14.  They perceive a violation of the statute's command to

achieve budget neutrality when adjusting DRGs because the Secretary applied her budget

neutrality adjustment to their hospital-specific *rates*, not to adjusted *DRG weights*, as the statute commands.  *See* Resp. to Order of the Ct. [Dkt. 37] at 2.  In addition, the Hospitals argue that the calculation of hospital-specific rates already includes artificially high DRG weights to calculate the average DRG in the base year, which cancels out the artificially high DRG weight to calculate a patient-specific payment upon discharge.  *See* Pl. MSJ at 15.  Therefore, they insist, when the Secretary multiplies hospital-specific rates by her cumulative budget neutrality adjustment, she imposes an unlawful reduction to their payment rates.  *Id.* at 15-16.

The Hospitals' argument starts with the use of DRG weights, both to calculate hospital-specific rates in the base year and to calculate payments for each patient upon discharge. As discussed above, hospital-specific rates start with the average cost per-patient discharge at the identified hospital in the base year; that product is divided by the average DRG weight for that hospital in the same base year; this cost figure is updated by multiplying it by a rate-of-increase percentage; the resulting quotient is then multiplied by a budget neutrality adjustment; and the product of that multiplication is further multiplied by the DRG weight specific to the particular patient upon discharge to determine the reimbursement amount under Medicare.  Plaintiff Hospitals argue that the DRG weights at both points (average DRG weight in the base year and DRG weight applicable to a specific patient upon discharge) are artificially high, which they contend is demonstrated by the necessity for a budget neutrality adjustment.  Were DRG weights not artificially high, they declare, it would not be necessary to reduce the DRG effect on final costs with any budget neutrality adjustment.

During a teleconference with the Court and in a later brief, *see* Dkt.  37, Plaintiff Hospitals further explained their logic:

1. The Medicare Act requires the Secretary to adjust DRG weights annually in a way that ensures that aggregate payments remain budget neutral.

2. The Secretary does not follow the precise text of the statute. Rather than ensuring budget neutrality by adjusting DRG *weights*, she applies a budget neutrality adjustment to hospital-specific *rates*.

3. Under the Secretary's approach, DRG weights are not adjusted and remain artificially high, *i.e.*, too high to achieve budget neutrality. To be budget neutral, DRG weights would have to be lower, as demonstrated by the Secretary's need for a budget neutrality adjustment despite the annual normalization of the DRG weights after adjustment.

4. In contrast to the federal rate, the formula for payments using a hospital-specific rate includes *two* DRG weights. That is, the calculation for each hospital-specific rate begins by calculating each Hospital's average cost per discharged Medicare patient in the base year. The average base-year per-patient cost is divided by the average DRG weight in the base year. The average DRG in the base year is "too high" because it was not adjusted to achieve budget neutrality. The use of an artificially high divisor into the average patient cost in the base year renders its quotient artificially low, which, in turn, renders the payment amount artificially low.

5. Thus, as the Secretary calculates, the base-year hospital payment rate is inevitably *lower* than it should be because the average DRG weight used as the divisor is artificially high, prior to application of a cumulative budget neutrality adjustment.

20

6. Because the Secretary does not adjust *DRG weights* annually to achieve budget neutrality (but relies on budget neutrality adjustments to *rates*), the DRG used to calculate a specific reimbursement for a discharged patient is *also* artificially high, *i.e.*, not budget neutral.

7. Accordingly, the Secretary uses artificially high DRG weights for *both* the base-year hospital payment rate *and* the patient-specific weight upon discharge. Further, these DRGs are artificially high in the *same* way. As a result, they counterbalance each other: the DRG weight used to calculate the hospital's base-year rate results in an artificially low payment rate, which the DRG weight for the specific patient upon discharge offsets.

8. Therefore, the Secretary made unlawful reductions to the Hospitals' payment rates when she applied a cumulative budget figure to the reimbursements to Plaintiff Hospitals in FY2009 and FY2010.

Notably, the Hospitals do not attack the budget neutrality adjustment per se but its cumulative application from FY1993 through the base year as it affected their payments in FY2009 and FY2010.

This reasoning is flawed. Assuming *arguendo* that each year's DRG adjustment results in weights that are artificially high, *i.e.*, not budget neutral, Plaintiff Hospitals fail to show that the application of a cumulative budget neutrality adjustment to hospital-specific rates, as opposed to adjusting each of the DRG weights separately, does not render aggregate payments budget neutral. Nor, to be more exact, do they demonstrate that the average DRG weight from a base year might be, or is, as artificially as high as the DRG weight pertaining to a specific hospital patient upon discharge so as to offset each other. In other words, even if there is some

21

"artificiality" in both DRG weights (base-year average and patient-specific), there is no basis to find that a uniform artificiality affects both numbers.

The average DRG weight from the base year is exactly that: an average of all DRG weighted diagnoses for discharged patients.  In contrast, the DRG weight specific to a single patient upon discharge represents the pre-set cost of treatment for a particular diagnosis. A specific DRG weight will not necessarily increase from year to year but may increase, decrease, or stay the same depending on "changes in treatment patterns [and] technology."  42 U.S.C. § 1395ww(d)(4)(C)(i).  Given this distinction, the average DRG weight in the base year cannot be said to be "too high" by the same amount as a patient's DRG upon discharge.  Despite all of their calculations, the Hospitals fail to demonstrate their premise that the average DRG from a base year is similar to a patient's DRG upon discharge in a way that they would necessarily offset.

Unfortunately, the Secretary provides no affirmative case or rationale for why her calculation—whereby she applies a budget neutrality adjustment to the Hospitals' *rates* rather than accomplishing budget neutrality by way of annual *DRG adjustments*—complies with the statutory budget neutrality requirement.  She appears to overlook completely this portion of the Hospitals' argument, intent as she is on arguing about whether she "botched" the math and how courts must defer to her expertise.  The Court does not find that the Secretary "botched" the math but neither can the Court find on this record that she has adequately explained why she applies a budget neutrality adjustment *after* instead of *in the process of* adjusting DRG weights each year, as the statute would appear to contemplate.  This is not to say that the Secretary may not have a perfectly legitimate reason, only that she has not presented it here.  Therefore, her motion for summary judgment must be denied.  Since the Secretary is silent on the point, the Court will

deny both parties' motions without prejudice with regard to this first issue and order further briefing.

### B.  Secretary's Failure to Engage in Rulemaking

In addition to their substantive challenges to the calculation methodology for SCHs in FY2009 and FY2010 and MDHs in FY2010, Plaintiff Hospitals raise a procedural challenge to the Secretary's 2008 instructions for calculating reimbursement rates for SCHs using base year FY2006.  The Secretary issued two instructions that year—the first did not require fiscal intermediaries to apply a budget neutrality adjustment cumulatively and the second did include such a requirement.  *See* Transmittal 1610 (Oct. 3, 2008); Joint Signature Memorandum (Nov. 17, 2008).  The Hospitals contend that the change in technical instructions required notice and comment rulemaking.  The Secretary insists that formal rulemaking was not required to correct an instruction that was only six weeks old.

Plaintiffs do not dispute that normal rebasing instructions issued by CMS are "interpretive rules" and do not require formal rulemaking.  *See* 5 U.S.C. § 553(b)(3)(A) (an exception to the public notice and comment requirement exists for "interpretive rules, general statements of policy, or rules of agency organization, procedure, or practice"); *Nat'l Medical Enters, Inc.*, 43 F.3d at 697 (finding that a Provider Reimbursement Manual provision "f[ell] well within the interpretive end of the spectrum" and did not require formal rulemaking); *Creighton Omaha Reg'l Health Care Corp. v. Bowen*, 822 F.2d 785, 791 (8th Cir. 1987) ("[P]rovisions in the Provider Reimbursement Manual and amendments thereto are 'interpretive rules,' not subject to the rule-making process of section 553.").  In the instant case, the Secretary issued rebasing instructions when Congress approved FY2002 as a new base year for MDHs. *See* Transmittal 1067.  Those instructions, which have since been changed through formal

rulemaking, directed fiscal intermediaries to apply a budget neutrality adjustment for reimbursements to MDHs only prospectively, *i.e.*, from 2002 rather than from 1993.  This set of instructions remained outstanding and was in effect when, in 2008, the Secretary issued similar instructions to fiscal intermediaries on implementing rebasing for SCHs using FY2006 as a base year.  *See* Transmittal 1610.  The SCH instructions followed the prior instructions for MDHs: they directed fiscal intermediaries to apply a budget neutrality adjustment only prospectively from 2006 and not from 1993.  *Id.*

      Mr. Hefter declares that DAC only realized this error when an outside consultant sent him an email inquiry about it.  Hefter Decl. ¶ 11 ("As a result of that inquiry, DAC came to recognize the inadvertent error . . . .").  Because no payments had been made to SCHs under the new rebasing instructions, the Secretary merely withdrew the faulty instruction and issued new instructions that contained directions to apply a full cumulative budget neutrality adjustment from FY1993.  *Id.* ¶ 12; Joint Signature Memorandum.  In contrast, payments based on the erroneous instructions had been made to MDHs, so the Secretary engaged in formal rulemaking before applying the full cumulative budget neutrality adjustment for those hospitals.  Hefter Decl. ¶ 13.

      Plaintiff Hospitals argue that the initial rebasing instructions for SCHs in 2008 constituted an "authoritative" interpretation as to which the instructions six weeks later constituted a "significant revision" requiring formal rulemaking.[12]  *See Paralyzed Veterans of*

---

[12] Plaintiff Hospitals also claim that the Secretary issued the second instructions in "secret."  *See* Pl. MSJ at 17.  The Secretary issued the second instructions only to fiscal intermediaries and did *not* publicize them to the affected SCHs.  However, she directed the fiscal intermediaries to "make the [budget neutrality adjustment] information available to SCHs."  *See* Joint Signature Memorandum at 2.

*Am.*, 117 F.3d at 586.  The Hospitals also rely on *Alaskan Professional Hunters*, 177 F.3d at 1036, which required formal rulemaking to change an informal instruction extant for 30 years.

For purposes of evaluating how "authoritative" the initial SCH rebasing instructions in 2008 might have been, the Court inquired into the decision process that led to the initial MDH rebasing instructions in 2006.  Mr. Hefter declares that the group of employees who worked on the instructions for MDHs in 2006 "would have been a different group," due to the passage of time, from those who worked on the instructions issued in 2000 that required cumulative budget adjustments.  Hefter Decl. ¶ 7.   As a matter of English grammar, "would have been different" and "were different" are distinguishable, and Mr. Hefter's Declaration remains uncertain because of his choice of tense.  Such uncertainty is not resolved by his statement that no current DAC employee in March 2013 worked on the instructions issued in 2006, Hefter Decl. ¶ 8, but the limitation to current DAC employees, as opposed to employees at CMS or HHS, undercuts even this statement.

Despite the Secretary's failure to explain herself clearly, the record shows that the first 2008 instruction for SCH rebasing, *see* Transmittal 1610, was inconsistent with the Secretary's 2000 instruction for SCH rebasing that required cumulative application of the budget neutrality adjustment, *see* Transmittal A-00-66.  Transmittal 1610 was also inconsistent with the Secretary's policy for many years preceding Transmittal A-00-66 in 2000, throughout which the Secretary required application of a cumulative budget neutrality adjustment to SCHs.  *See* FY1994 Final Rule, 58 Fed. Reg. at 46,346.   Any change to such outstanding authoritative interpretations would normally have required rulemaking.  *See Paralyzed Veterans of Am.*, 117 F.3d at 586.

No rulemaking preceded Transmittal 1610, the first 2008 instruction for SCH rebasing, and the Secretary issued an amended instruction within six weeks. It is not difficult to conclude that the first 2008 rebasing instruction for SCHs was contrary to the Secretary's policy and that the second instruction merely corrected a mistake to ensure conformity with a longstanding and consistent policy. Since no payments to SCHs were made under the erroneous instruction, no SCH can legitimately argue that it relied upon the short-lived transmittal. Because the Court concludes that the first 2008 rebasing instruction was a mistake and that the second 2008 rebasing instruction was consistent with the Secretary's policy for calculating SCH reimbursement rates prior to 2008, the Secretary was not required to engage in rulemaking when issuing the second instruction.

Deciding that the Secretary could promptly correct erroneous SCH payment instructions without formal rulemaking is not quite the end of the inquiry. The Secretary ties rebasing instructions for SCHs and MDHs together. *See* Def. MSJ at 19-20. Her recognition of this connection is germane inasmuch as Transmittal 1067 issued in 2006 for MDH rebasing interpreted the very same statutory language applicable to SCHs, not merely an MDH-specific regulation. In this sense, Transmittal 1067 issued in 2006 provided an authentic and official interpretation of the statutory requirements for both kinds of Hospitals, and SCHs might have legitimately anticipated the same treatment when Congress adopted a new base year for them— or, at least, formal rulemaking to change such treatment.

Although clumsily presented, DAC explains a negligent, not intentional, error in connection with Transmittal 1067 that omitted a full cumulative budget neutrality adjustment for MDHs in 2006. There is no hint, or argument, that the error was either intentional or caused by malfeasance. Additionally, the "harm" resulting from the error was to the federal government:

more money was paid to MDHs than intended by Congress from FY2007 until FY2010.  Not only did MDHs experience no harm, but SCHs also were not harmed by Transmittal 1067. Congress had not added a new base year for SCHs, and they continued to be paid according to Transmittal A-00-66, which included a full cumulative budget neutrality adjustment.  Without affirmative misconduct by the government or detrimental reliance by the plaintiff, a plaintiff cannot establish a case for estoppel against the government.  *See Keating v. FERC*, 569 F.3d 427, 434 (D.C. Cir. 2009) (stating the requirements for succeeding on a claim of equitable estoppel against the government).  In order to argue successfully that the instruction to fiscal intermediaries issued in 2006 concerning MDHs, which included only a limited budget neutrality adjustment, was an "authoritative" interpretation applicable to SCHs two years later, SCHs would need to estop the government from any other conclusion.  This cannot be accomplished on this record.

The APA does not require the Secretary to have engaged in formal rulemaking to correct an informal six-week-old mistake in a rebasing instruction for SCHs.  The Secretary did not violate the procedural requirements of the APA with her 2008 rebasing instructions for SCHs.[13]

## IV.  CONCLUSION

For the foregoing reasons, the Secretary's Cross-Motion for Summary Judgment [Dkt. 24] will be granted in part and denied in part.  The Court will grant the Secretary's motion for summary judgment on the issue of whether the Secretary was required to engage in rulemaking when issuing the second 2008 rebasing instruction for SCHs and deny Plaintiffs'

---

[13] In light of this Court's prior ruling that this case is properly before it, *see* Mem. Op. at 4, it need not reach the question of whether PRRB's decision as to its jurisdiction was correct as a matter of law, which was raised in Count I of Plaintiffs' Complaint.  *See* Compl. ¶¶ 23-25.

Motion for Summary Judgment [Dkt. 22] on this issue.  The Court will deny both the Secretary's and Plaintiffs' motions for summary judgment without prejudice on the issue of whether the Secretary's application of a cumulative budget neutrality adjustment for sole community hospitals in FY2009 and FY2010, and for Medicare-dependent, small rural hospitals in FY2010, violates the APA and order further briefing.  A memorializing Order accompanies this Opinion.

Date:   March 27, 2013                               _____/s/_____
                                                     ROSEMARY M. COLLYER
                                                     United States District Judge