# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| ADIRONDACK MEDICAL CENTER, *et al.*, ) | |
| ) | |
| Plaintiffs, ) | |
| ) | |
| v. ) | Civil Action No. 11-313 (RMC) |
| ) | |
| KATHLEEN SEBELIUS, Secretary, ) | |
| Department of Health and Human Services, ) | |
| ) | |
| Defendant. ) | |

## OPINION

Seemingly intended to test the mathematical acumen of counsel and court, this case arises out of the legislative and regulatory thicket that is Medicare reimbursement. At issue is a congressional mandate that requires the Secretary of Health and Human Services to adjust annually one component of the Medicare reimbursement formulas in a budget neutral manner, so that it is not the cause of either higher or lower overall Medicare hospital reimbursements from one year to the next. Plaintiffs are hospitals that serve rural communities or the uninsured poor; they sue the Secretary for shortchanging their reimbursements in specific fiscal years. Plaintiffs allege that the Secretary has deprived them of millions of dollars in Medicare reimbursements by improperly achieving budget neutrality through changes to their reimbursement *rates* rather than through adjustments to the mandated *component* of the rate formula. Unsurprisingly, the Secretary disagrees. Out of the parties' arguments concerning numerators, denominators, and quotients, a more familiar question has emerged: is the Secretary's methodology a rational interpretation of the Medicare Act to which the Court should defer? Because the Court answers this question affirmatively, it will grant summary judgment to the Secretary.

# I. FACTS

On February 7, 2011, sixty-two sole community hospitals (SCHs) and Medicare-dependent, small rural hospitals (MDHs)[1] filed a three-count Complaint against Kathleen Sebelius, in her official capacity as Secretary of Health and Human Services (HHS).  Only Counts II and III are relevant here: Plaintiff Hospitals contend that the Secretary erroneously calculated their Medicare reimbursements starting in Fiscal Year 2009.  *See* Compl. [Dkt. 1]. They claim that the Secretary has failed to follow clear congressional directions in the Medicare Act, *see* 42 U.S.C. § 1395ww(d)(4)(C)(iii), and, in so doing, her erroneous calculations are both *ultra vires* and arbitrary and capricious in violation of the Administrative Procedure Act (APA),

---

[1] The Plaintiffs are: Adirondack Medical Center; Agnesian Healthcare, Inc.; Albemarle Hospital Authority; Augusta Health Care, Inc.; Bates County Memorial Hospital; Benefis Hospitals, Inc.; Blessing Hospital; Bothwell Regional Health Center; Cape Cod Healthcare, Inc.; CarolinaEast Medical Center; Carson Tahoe Regional Healthcare; CGH Medical Center; Champlain Valley Physicians Hospital; Chesapeake Hospital Corporation; Clallam County Public Hospital District 2; Clearfield Hospital; Community Memorial Healthcenter; Cortland Regional Medical Center, Inc.; Golden Valley Memorial Hospital District; Graham Hospital Association; Grenada Lake Medical Center; Holy Rosary Healthcare; IHC Health Services Inc.; Joint Township District Memorial Hospital; Lake Regional Health System; Lawrence Memorial Hospital; LRGHealthcare; Mary Lanning Memorial Hospital; McAlester Regional Health Center Authority; McDonough County Hospital District; Memorial Hospital of Sheridan County; Memorial Medical Center of West Michigan; Mid-Columbia Medical Center; Munson Medical Center; Otero County Hospital Association; Otsego Memorial Hospital; Passavant Memorial Area Hospital Association; Phelps County Regional Medical Center; Promise Regional Medical Center-Hutchison, Inc.; Rapid City Regional Hospital Inc.; Regional West Medical Center; Reid Hospital & Health Care Services Inc.; Rice Memorial Hospital; Salina Regional Health Center, Inc.; Sarah Bush Lincoln Health Center; Sky Lakes Medical Center Inc.; Southeastern Regional Medical Center; Southern Illinois Hospital Services; Southwest Medical Center; Southwestern Vermont Medical Center Inc.; SSM Regional Health Services; St. James Healthcare Inc.; St. Joseph Regional Medical Center; St. Joseph's Medical Center; St. Luke's Magic Valley Regional; St. Mary's Hospital & Medical Center Inc.; Still Water Medical Center Authority; The Rutland Hospital, Inc.; Valley View Hospital Association; Wayne Memorial Hospital Inc.; Waynesboro Hospital; and Western Missouri Medical Center.  The Court refers to them collectively as either "Plaintiff Hospitals" or "Hospitals."

5 U.S.C. §§ 701 *et seq.  See* Compl. ¶¶ 28-29, 33-34.[2]  Accordingly, the Court must embark upon

a journey through the "labyrinthine world of Medicare."  *Adirondack Med. Ctr. v. Sebelius*, 740

F.3d 692, 694 (D.C. Cir. 2014).[3]

### A.  Basics of Medicare Reimbursements

The Centers for Medicare and Medicaid Services (CMS), a division of HHS,

administers Medicare under the executive management of the Secretary, *see* 42 U.S.C. §§ 1395

*et seq.*  To incentivize hospitals serving Medicare patients to control costs, Congress revised the

Medicare reimbursement scheme in 1983 and established the Inpatient Prospective Payment

System (IPPS).  *See Methodist Hosp. of Sacramento v. Shalala*, 38 F.3d 1225, 1227 (D.C. Cir.

1994) (describing the transition in 1983 to IPPS and explaining that it was "designed . . . to

encourage health care providers to improve efficiency and reduce operating costs").  Under

IPPS, the Secretary informs all hospitals, before a fiscal year begins, of the "rates at which their

services will be reimbursed, regardless of costs actually incurred."  *Id.*; *see also* 42 U.S.C.

§ 1395ww(d).  This litigation concerns two of the factors used in calculating prospective

Medicare reimbursement rates: Diagnosis-Related Groups (DRG) and Budget Neutrality

Adjustments (occasionally, BNA).

---

[2] On earlier cross motions for summary judgment, the Court granted partial summary judgment to the Secretary, finding that the APA did not require her to engage in formal rulemaking before issuing instructions for SCHs in 2008 that merely corrected a six-week-old mistake.  *See Adirondack Med. Ctr. v. Sebelius* (*Adirondack I*), 935 F. Supp. 2d 121, 137 (D.D.C. 2013).  *Adirondack I* concluded that the issues presented here could not be decided because the Secretary had "provide[d] no affirmative case or rationale" for her calculations.  *Id.* at 134.  Inasmuch as *Adirondack I* set forth much of the factual and procedural background relevant here, the Court assumes familiarity with that decision and draws liberally from it, repeating its prose without citation to the extent it is germane here.

[3] Despite the case caption, the cited D.C. Circuit decision is not connected to the instant litigation.  It concerned a challenge to the Secretary's decision to adjust payment rates for SCHs and MDHs downward.  *See id.* at 695-96.

### 1. Diagnosis-Related Groups

As the Circuit has succinctly explained, "a DRG is a category of inpatient treatment." *Adirondack Med. Ctr.*, 740 F.3d at 694 n.1. It attempts to account for the fact that "the costs of treating patients vary based on the patients' diagnoses." *Cape Cod Hosp. v. Sebelius*, 630 F.3d 203, 205 (D.C. Cir. 2011). Accordingly, Medicare patients are assigned a DRG based on their diagnosis at the time of discharge. Each DRG is associated with "a particular 'weight' [that] represent[s] the relationship between the cost of treating patients within that group and the average cost of treating all Medicare patients." *Id.* at 205-06 (citing 42 U.S.C. § 1395ww(d)(4)). There are hundreds of different DRGs, *see State of Florida, Office of Attorney General, Department of Legal Affairs v. Tenet Healthcare Corp.*, 420 F. Supp. 2d 1288, 1293 (S.D. Fla. 2005), with individual weights ranging from less than 1.000 to more than 7.000 and an average weight, in theory, of 1.000,[4] Tr. of Feb. 25, 2013 Hr'g [Dkt. 38] at 8:1-3. In other words, if the theoretical DRG weight for the average cost of a patient's in-hospital treatment were 1.000,[5] then "a case using twice as many resources as the average case would be assigned the value of 2, and a case using only half the resources as the average case would have a weight of 0.5." Am. Health Lawyers Ass'n, *supra*, § 3-2(b). The upshot of applying a DRG weighting factor is that "a hospital will be paid more for patients diagnosed with a heart

---

[4] Amici provided this information to the Court. The Amici are: Knox Community Hospital; Edward John Noble Hospital of Gouverneur, New York; Hanover Hospital, Inc.; Hays Medical Center, Inc.; Labette County Medical Center; Memorial Hospital of Sweetwater County; Mercy Hospital Lebanon; Mercy Memorial Health Center, Inc.; Newman Memorial County Hospital; North Platte Nebraska Hospital Corporation; Northwestern Medical Center, Inc.; Pocatello Hospital, LLC; and Richmond Memorial Hospital. *See* Oct. 31, 2012 Minute Order (granting Amici's Motion for Leave to File Brief, Dkt. 27).

[5] The 1.000 index value "does not derive from any statutory requirement, and various developments have caused the average [DRG weight] to deviate from the theoretical norm." Am. Health Lawyers Ass'n, Medicare Law § 3-2(b)(2) (Thomas W. Coons, *et al.* eds., 3d ed. 2012).

condition requiring surgery than for those diagnosed with a sprained ankle." Def. Mot. for Summ. J. [Dkt. 23] at 4.

Starting in Fiscal Year 1988, Congress required the Secretary to adjust DRG weighting factors "at least annually . . . to reflect changes in treatment patterns, technology . . . , and other factors which may change the relative use of hospital resources." 42 U.S.C. § 1395ww(d)(4)(C)(i). Then, in Fiscal Year 1991, *see* Decl. of Tzvi Hefter [Dkt. 40] ¶ 4, Congress directed the Secretary to ensure that the annual adjustments to DRG weighting factors not result in an overall increase in projected aggregate IPPS payments, 42 U.S.C. § 1395ww(d)(4)(C)(iii). Specifically, the annual DRG recalibration must "be made in a manner that assures that the aggregate payments . . . for discharges in the fiscal year are not greater or less than those that would have been made for discharges in the year without such adjustment." *Id.* The parties agree that this subsection of Medicare stands for the proposition that other factors might increase the cost of Medicare reimbursements but the Secretary must ensure that annual changes to DRG weights have a budget-neutral effect.

In connection with recalibrating DRG weights each year, the Secretary "normalizes" the weights so that the "average case weight after recalibration is equal to the average case weight prior to recalibration." Rulemaking R. (74 Fed. Reg. 24080 (May 22, 2009)) [Dkt. 20] at 106. The Secretary has determined, however, that normalization alone does not achieve budget neutrality for recalibrated DRGs. *See id.* ("While [normalization] is intended to ensure that recalibration does not affect total payments to hospitals, . . . [the Secretary's] analysis . . . indicate[s] that the normalization adjustment does not achieve budget neutrality with

respect to aggregate payments to hospitals . . . .").[6] As a result, the Secretary calculates an additional adjustment—a so-called Budget Neutrality Adjustment—to satisfy the congressional directive that changes to DRG weighting factors not increase projected aggregate IPPS payments.[7] *Id.*

## 2. The Budget Neutrality Adjustment

The Secretary calculates the Budget Neutrality Adjustment by way of payment simulations. She computes a budget neutrality factor by comparing "estimated aggregate payments using the current year's relative weights and factors to aggregate payments using the prior year's relative weights and factors."[8] *Id.* As the Secretary explained in the preamble to the notice of a final rule revising IPPS and Fiscal Year 1991 rates, which she published in the Federal Register in 1990, this "methodology effectively isolate[s] the impact of changes in the relative weights," and, therefore, "provide[s] a proper basis for computing the [BNA] factor." 55 Fed. Reg. 35990, 36074 (Sept. 4, 1990).[9]

---

[6] The Secretary explained that normalization does not achieve budget neutrality as early as 1990. *See* 55 Fed. Reg. 19426, 19466 (May 9, 1990) (explaining in the preamble to a proposed rule concerning IPPS changes for Fiscal Year 1991 that the Secretary's "analysis indicates that the normalization adjustment does not achieve budget neutrality with respect to aggregate payments to hospitals").

[7] The Court notes that the Secretary refers to the Budget Neutrality Adjustment as the "DRG budget neutrality adjustment." *See* Def. Mot. for Summ. J. at 5; Def. Supp. Brief [Dkt. 46] at 1. This phrasing suggests that the Secretary calculates a Budget Neutrality Adjustment in combination with the annual adjustments to DRG weights to produce budget-neutral DRG weights. Such an inference would be inaccurate, and the Court declines to adopt phrasing that could be misleading.

[8] The Budget Neutrality Adjustment "is almost always a number slightly less than one." Pl.'s Mot. for Summ. J. [Dkt. 22] at 5. For instance, the Fiscal Year 2007 Budget Neutrality Adjustment factor was 0.997395. *Id.* at 7.

[9] The 1990 Final Rule also stated that the Secretary accounts for changes in the "wage index" when calculating the Budget Neutrality Adjustment. The wage index adjustment is not at issue

In 1993, in conjunction with publishing notice in the Federal Register of a final rule that altered certain aspects of IPPS and Fiscal Year 1994 rates, the Secretary addressed the cumulative application of the Budget Neutrality Adjustment. The preamble to the 1993 Final Rule explained that in calculating and applying the budget neutrality factor for a future fiscal year, no attempt is made to remove the effect of prior years' neutrality adjustments. *See* 58 Fed. Reg. 46270, 46346 (Sept. 1, 1993). In the Secretary's view, a cumulative Budget Neutrality Adjustment is mandated by the language of 42 U.S.C. § 1395ww(d)(4)(C)(iii) and the nature of the hospital-specific rate. "She do[es] not remove the prior budget neutrality adjustment[s] because the statute requires that aggregate payments after the changes in the DRG relative weights . . . equal estimated payments prior to the changes. If [the Secretary] removed the prior year adjustment, [she] would not be able to satisfy this condition." *Id.* If the adjusted DRG weights were not further adjusted for budget neutrality, then, according to the Secretary, "the hospital-specific amounts would be artificially high" which would "result[] in higher aggregate payments than permitted under the statute." Rulemaking R. at 106.

Thus, the Secretary has applied a cumulative Budget Neutrality Adjustment in each successive fiscal year for more than two decades. Stated differently, since 1994, the Secretary has not removed the effects of prior years' Adjustments when calculating the Budget Neutrality Adjustment for the upcoming fiscal year. It is the manner in which the Secretary applies the annual Budget Neutrality Adjustment to the hospital-specific rate by which Plaintiffs are reimbursed which is at the heart of this case.

---

here, and the Secretary does not rely on its inclusion to challenge Plaintiffs' math. *See* Def. Supp. Brief at 5 n.1. For the sake of clarity, the Court does not reference it.

## B.  Medicare Reimbursement Formulas

Each Plaintiff Hospital in the instant litigation has been designated either an SCH or an MDH under Medicare.  *See* 42 U.S.C. § 1395ww(d)(5)(D)(iii) (defining SCH); *id.* § 1395ww(d)(5)(G)(iv) (defining MDH).  SCHs and MDHs are reimbursed for inpatient treatment based on the "federal rate" or the "hospital-specific rate."

### 1.  The Federal Rate

Most IPPS hospitals are reimbursed under the "federal rate."[10]  *See* 42 C.F.R. § 412.64.  To calculate the federal rate, "Medicare authorities first construct a standard nationwide cost rate . . . based on the average operating costs of inpatient hospital services." *Methodist Hosp.*, 38 F.3d at 1227.   This figure, which is known as the "average standardized amount," or, more simply, the "standardized amount," averages the operating costs of all IPPS hospitals, including SCHs and MDHs.  *See* 42 C.F.R. 412.64(g).  Each year, the standardized amount is updated for inflation, based on an "applicable percentage increase," 42 U.S.C. § 1395ww(b)(3)(B), that is taken from a "market basket index," 42 C.F.R. § 412.64(d).  Once an updated standardized amount is calculated, the Secretary multiples it by the Budget Neutrality Adjustment for the upcoming year.  *See* 42 U.S.C. §§ 1395ww(d)(3)(C); *see, e.g.*, 58 Fed. Reg. at 46358 (explaining the calculation of the federal rate for Fiscal Year 1994 and noting that the Budget Neutrality Adjustment "is applied to the standard Federal payment rate").  To calculate the actual reimbursement to most IPPS hospitals for specific inpatient care, the product of the standardized amount and the Budget Neutrality Adjustment is multiplied by the DRG weight that corresponds to the patient's diagnosis at discharge.  *See* 42 U.S.C. § 1395ww(d)(3)(D).  The

---

[10] The statute calls this rate the "national adjusted … prospective payment rate."  42 U.S.C. § 1395ww(d)(1)(A)(iii)(I).

result is the amount of reimbursement the hospital will receive under the federal rate for the patient's in-hospital care, regardless of actual cost.

### 2. The Hospital-Specific Rate

Because SCHs and MDHs provide critical services to the underserved and uninsured, Congress has adopted special payment provisions for them. *Adirondack Med. Ctr.*, 740 F.3d at 694. However, reimbursement calculations for SCHs and MDHs are different. "Reimbursements for [SCHs] are fairly straightforward—such hospitals are paid the higher of either the federal rate or the hospital-specific rate." *Id.* at 695 n.2. Reimbursement to MDHs is slightly more complicated. MDHs receive a rate that "is calculated by taking the federal rate and adding 75% of the difference between the federal rate payment and the hospital-specific rate payment." *Id.*; *see* 42 U.S.C. §§ 1395ww(d)(5)(D) & (G); 42 C.F.R. §§ 412.92, 412.108.[11] The hospital-specific rate is particular to each of Plaintiff Hospitals. It "is calculated with a base amount derived not from national data, but from historic operating costs at [the] individual hospital." *Adirondack Med. Ctr.*, 740 F.3d at 695.

Calculating the hospital-specific rate for an SCH or MDH is a relatively simple, three-step process. First, the hospital's historic average cost per patient in a particular base year is divided by the average patient DRG weight for that base year, repeated for each base year authorized by Congress.[12] *See, e.g.*, 42 C.F.R. §§ 412.73(a)-(b), 412.75(b)-(c), 412.77(c)-(d), 412.78(c)-(d), 412.79(b)-(c); 412.92(d); 412.108(c). Second, the highest resulting quotient is multiplied by an update factor. *See* Joint Statement [Dkt. 36] at 2. ("[T]o account for

---

[11] The statute refers to the payment that the hospital-specific rate calculation produces as the "target amount." 42 U.S.C. §§ 1395ww(b)(3), (d)(5)(D), & (d)(5)(G).

[12] MDHs may use Fiscal Years 1982, 1987, or 2002 as a base year. SCHs may use Fiscal Years 1982, 1987, 1996, or 2006 as a base year. *See* 42 C.F.R. § 412.92(d); *id.* § 412.108(c).

inflation . . . between the base year period and the payment year period, CMS applies an update

factor to the hospital's average case-mixed adjusted base-period operating cost per discharge.").

That product is further multiplied by the applicable Budget Neutrality Adjustment for the year of

treatment.  *See id.*; *see, e.g.*, 42 C.F.R. § 412.73(d) & (f).  Finally, the resulting product is

multiplied by the DRG weight applicable to the discharged patient, thus arriving at the actual

Medicare reimbursement.  *See* Joint Statement at 3; *see, e.g.*, 42 C.F.R. § 412.73(e).

### C.  The Instant Litigation

When Congress adds a new base year for SCHs and MDHs, the Secretary

provides technical instructions, or "rebasing" instructions, to fiscal intermediaries concerning the

computations of new hospital-specific rates.[13]  In 2006, Congress added Fiscal Year 2002 as a

base year for calculating hospital-specific rates for MDHs, effective for cost reporting periods

beginning on or after October 1, 2006.  *See* Deficit Reduction Act of 2005, Pub. L. No. 109-171,

§ 5003(b), 120 Stat. 4, 32 (codified as amended at 42 U.S.C. § 1395ww(b)(3)(K) (2006)).  Then,

in 2008, Congress added Fiscal Year 2006 as a new base year for SCHs, effective for cost

reporting periods beginning on or after January 1, 2009.  *See* Medicare Improvements for

Patients and Providers Act of 2008, Pub. L. No. 110-275, § 122, 122 Stat. 2494, 2514 (codified

as amended at 42 U.S.C. § 1395ww(b)(3)(L) (2008)).  The rebasing instructions that the

Secretary issued for these new base years prompted this lawsuit.

---

[13] Fiscal intermediaries, generally private insurance companies that process Medicare claims, are also known as Medicare administrative contractors.  *See* 42 U.S.C. § 1395h.  They perform the calculations described in the text, as instructed by the Secretary.

### 1. The Secretary's Rebasing Instructions for Fiscal Years 2002 and 2006

Although the Secretary had previously directed fiscal intermediaries to apply the Budget Neutrality Adjustment in a cumulative fashion,[14] the Secretary's initial rebasing instructions for the new base years of Fiscal Years 2002 (MDHs) and 2006 (SCHs) did not include such a direction.   Rather, for MDH calculations relying on a base year of Fiscal Year 2002, the Secretary directed that Budget Neutrality Adjustments be applied only prospectively for years after the base year, *i.e.*, from Fiscal Year 2003 forward.  Rulemaking R. (Transmittal 1067) [Dkt. 20-3] at 1217.  Similar rebasing instructions were issued for payments to SCHs in 2008, directing fiscal intermediaries to apply Budget Neutrality Adjustments only prospectively after Fiscal Year 2006.  *See* Pls. Mot. for Summ. J. [Dkt. 22], Ex. A [Dkt. 22-1] (Transmittal 1610).

The implementation instructions for SCHs were short-lived.  Six weeks after issuance, on November 17, 2008, the Secretary rescinded her initial SCH payment instructions and replaced them with instructions for fiscal intermediaries that required application of full cumulative Budget Neutrality Adjustments from Fiscal Year 1993 forward.  Rulemaking R. (Joint Signature Memorandum) [Dkt. 20-3] at 1209-12; *see also Adirondack I*, 935 F. Supp. 2d at 126.  Realizing that the rebasing instructions for the MDHs contained the same error but had been outstanding for a longer period, the Secretary issued a Proposed Rule to require cumulative budget neutrality for them as well.  Rulemaking R. at 106-07.  In Fiscal Year 2010, the Secretary issued a Final Rule for MDHs that directed inclusion of all cumulative Budget Neutrality

---

[14] *See e.g.*, Rulemaking R. (Transmittal A-00-66) [Dkt. 20-3] at 1207 (directing fiscal intermediaries for SCHs to apply cumulative BNAs following Congress's addition of Fiscal Year 1996 as a new base year in the Medicare, Medicaid, and State Children's Health Insurance Program Balanced Budget Refinement Act of 1999, Pub. L. No. 106-113, § 405, 113 Stat. 1501, 1501A372-73).

Adjustments since Fiscal Year 1993, as of October 1, 2009, the beginning of Fiscal Year 2010. *See* Rulemaking R. [Dkt. 20-4] at 1385 (74 Fed. Reg. 43754 (Aug. 27, 2009)).

## 2. Procedural History

Plaintiff Hospitals sought review before the Provider Reimbursement Review Board (PRRB) of the decisions to apply cumulative Budget Neutrality Adjustments to SCHs in Fiscal Years 2009 and 2010 and MDHs in Fiscal Year 2010.[15] *See* 42 U.S.C. § 1395oo(a). Plaintiff Hospitals filed group appeals with PRRB, seeking expedited judicial review pursuant to 42 U.S.C. § 1395oo(f)(1) and 42 C.F.R. § 405.1842. PRRB issued two separate but almost identical opinions. *See* PRRB Decision Regarding SCHs at 146-54; PRRB Decision Regarding MDHs at 1500-07. PRRB decided that it lacked jurisdiction to address the appeals. It ruled in the alternative that if it had jurisdiction, it lacked authority to rule on the underlying legal question and expedited review in federal court would be appropriate. *Id.* Because the Administrator of CMS declined review within sixty days after PRRB's decisions, *see* Admin. R. (Declination of Review Notice) [Dkt. 19] at 272; Admin. R. (Declination of Review Notice) [Dkt. 19-3] at 1492, the matters became ripe for court review, *see* 42 U.S.C. §§ 1395oo(f); 42 C.F.R. §§ 405.1875(a)(2) & 405.1877(a)(2)-(3).

Plaintiff Hospitals filed suit on February 7, 2011, and, as relevant here, alleged that the manner in which the Secretary applied the Budget Neutrality Adjustment to the reimbursement calculations to SCHs beginning in Fiscal Year 2009 and MDHs beginning in

---

[15] PRRB issued two decisions. The decision regarding PRRB Case Nos. 09-1893GC, 09-2214GC, and 09-1872G concerned the SCH challenge to the cumulative rebasing in Fiscal Years 2009 and 2010, *see* Admin. R. (PRRB Decision Regarding SCHs) [Dkt. 19] at 146-54, whereas the decision regarding PRRB Case No. 10-0663G addressed the MDH challenge to the Fiscal Year 2010 Final Rule, *see* Admin. R. (PRRB Decision Regarding MDHs) [Dkt. 19-3] at 1500-07. Each Plaintiff Hospital was a party to one of these decisions, except for Case No. 09-1893GC, to which none of the Plaintiffs was a party. Def. Mot. for Summ. J. at 16 n.7.

Fiscal Year 2010 was *ultra vires* and arbitrary and capricious in violation of the APA. The Secretary moved to dismiss and remand, arguing that the case was not ready for judicial review because PRRB had ruled improperly that it did not have jurisdiction and had not issued a final decision on the merits. *See* Mot. to Dismiss [Dkt. 8]. This Court denied the Secretary's Motion, finding that PRRB also had ruled that expedited review was appropriate and that the failure of the CMS Administrator to take any action within sixty days rendered PRRB's decisions final agency actions. *See* Mem. Op. [Dkt. 13] at 4.

The parties filed cross-motions for summary judgment. On March 27, 2013, the Court granted summary judgment in part to the Secretary, finding that the Secretary's 2008 rebasing instructions for SCHs did not violate the APA for lack of formal rulemaking. *Adirondack I*, 935 F. Supp. 2d at 137 (finding that the "APA does not require the Secretary to have engaged in formal rulemaking to correct an informal six-week-old mistake in a rebasing instruction for SCHs"). However, the Court denied summary judgment to both parties with respect to the manner in which the Secretary applied the Budget Neutrality Adjustment to the reimbursement calculations for SCHs beginning in Fiscal Year 2009 and MDHs beginning in Fiscal Year 2010 and ordered further briefing. The matter is now ripe.

## II. LEGAL STANDARDS

### A. Summary Judgment

Under Rule 56 of the Federal Rules of Civil Procedure, summary judgment shall be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *accord Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986). "In a case involving review of a final agency action under the Administrative Procedure Act, however, the standard set forth in Rule 56[ ] does

not apply because of the limited role of a court in reviewing the administrative record." *Sierra Club v. Mainella*, 459 F. Supp. 2d 76, 89 (D.D.C. 2006) (internal citation omitted), *appeal dismissed*, Nos. 06-5419 & 07-5004, 2007 WL 1125716 (D.C. Cir. Mar. 30, 2007); *see also Charter Operators of Alaska v. Blank*, 844 F. Supp. 2d 122, 126-27 (D.D.C. 2012); *Buckingham v. Mabus*, 772 F. Supp. 2d 295, 300 (D.D.C. 2011). Under the APA, the agency's role is to resolve factual issues to reach a decision supported by the administrative record, while "'the function of the district court is to determine whether or not as a matter of law the evidence in the administrative record permitted the agency to make the decision it did.'" *Sierra Club*, 459 F. Supp. 2d at 90 (quoting *Occidental Eng'g Co. v. INS*, 753 F.2d 766, 769-70 (9th Cir. 1985)). "Summary judgment thus serves as the mechanism for deciding, as a matter of law, whether the agency action is supported by the administrative record and otherwise consistent with the APA standard of review." *Id.* (citing *Richards v. INS*, 554 F. 2d 1173, 1177 & n. 28 (D.C. Cir. 1977)).

### B. APA Review

Plaintiff Hospitals allege that the Secretary's method for calculating the hospital-specific rates for SCHs and MDHs using Fiscal Year 2002 and Fiscal Year 2006 as the applicable base years violates 5 U.S.C. §§ 706(2)(A) and (C) of the APA. They claim that the Secretary has acted "in excess of her statutory jurisdiction, authority and limitations," Compl. ¶ 29, and arbitrarily and capriciously, *id.* ¶ 33. Their argument presents two familiar administrative-law inquiries: (1) whether the Secretary acted within the confines of the authority delegated to her by Congress; and (2) whether there was a rational basis for her actions.

### 1. The *Chevron* Review Standard

Plaintiff Hospitals' argument that the Secretary acted *ultra vires* is premised on three basic tenets of administrative law. First, "an agency's power is no greater than that

delegated to it by Congress." *Lyng v. Payne*, 476 U.S. 926, 937 (1986); *see also Transohio Sav. Bank v. Dir., Office of Thrift Supervision*, 967 F.2d 598, 621 (D.C. Cir. 1992).  Second, agency actions beyond delegated authority are *ultra vires* and should be invalidated.  *Transohio*, 967 F.2d at 621.  Third, courts look to an agency's enabling statute and subsequent legislation to determine whether the agency has acted within the bounds of its authority.  *Univ. of D.C. Faculty Ass'n/NEA v. D.C. Fin. Responsibility & Mgmt. Assistance Auth.*, 163 F.3d 616, 620-21 (D.C. Cir. 1998) (explaining that *ultra vires* claims require courts to review the relevant statutory materials to determine whether "Congress intended the [agency] to have the power that it exercised when it [acted]").

When reviewing an agency's interpretation of its enabling statute and the laws it administers, courts are guided by "the principles of *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984)."  *Mount Royal Joint Venture v. Kempthorne*, 477 F.3d 745, 754 (D.C. Cir. 2007).  *Chevron* sets forth a two-step inquiry.  The initial question is whether "Congress has directly spoken to the precise question at issue."  *Chevron*, 467 U.S. at 843.  If so, then "that is the end of the matter" because both courts and agencies "must give effect to the unambiguously expressed intent of Congress."  *Id.* at 842-43.  To decide whether Congress has addressed the precise question at issue, a reviewing court applies "'the traditional tools of statutory construction.'"  *Fin. Planning Ass'n v. SEC*, 482 F.3d 481, 487 (D.C. Cir. 2007) (quoting *Chevron*, 467 U.S. at 843 n.9).  It analyzes "the text, structure, and the overall statutory scheme, as well as the problem Congress sought to solve."  *Id.* (citing *PDK Labs. Inc. v. DEA*, 362 F.3d 786, 796 (D.C. Cir. 2004); *Sierra Club v. EPA*, 294 F.3d 155, 161 (D.C. Cir. 2002)).  When the statute is clear, the text controls and no deference is extended to an agency's

interpretation in conflict with the text. *Chase Bank USA, N.A. v. McCoy*, 131 S. Ct. 871, 882 (2011).

If the statute is ambiguous or silent on an issue, a court proceeds to the second step of the *Chevron* analysis and determines whether the agency's interpretation is based on a permissible construction of the statute. *Chevron*, 467 U.S. at 843; *Sherley v. Sebelius*, 644 F.3d 388, 393-94 (D.C. Cir. 2011). Under *Chevron* Step 2 a court determines the level of deference due to the agency's interpretation of the law it administers. *See Mount Royal Joint Venture*, 477 F.3d at 754. Where, as here, "an agency enunciates its interpretation through notice-and-comment rule-making or formal adjudication, [courts] give the agency's interpretation *Chevron* deference." *Id.* at 754 (citing *United States v. Mead Corp.*, 533 U.S. 218, 230-31 (2001)). That is, an agency's interpretation that is permissible and reasonable receives controlling weight,[16] *id.*, "even if the agency's reading differs from what the court believes is the best statutory interpretation," *see National Cable & Telecommunications Ass'n v. Brand X Internet Services*, 545 U.S. 967, 980 (2005). Such broad deference is particularly warranted when the regulations at issue "concern[] a complex and highly technical regulatory program." *Thomas Jefferson Univ. v. Shalala*, 512 U.S. 504, 512 (1994) (internal quotation marks and citation omitted).

## 2. Arbitrary and Capricious Review

Plaintiff Hospitals contend that the Secretary's calculations were arbitrary, capricious, and not in accord with the law in violation of § 706(2)(A) of the APA. *See Tourus Records, Inc. v. DEA*, 259 F.3d 731, 736 (D.C. Cir. 2001). The basic legal tenets here are also longstanding and clear. In determining whether an action was arbitrary and capricious, a reviewing court "must consider whether the [agency's] decision was based on a consideration of

---

[16] An interpretation is permissible and reasonable if it is not arbitrary, capricious, or manifestly contrary to the statute. *Mount Royal Joint Venture*, 477 F.3d at 754.

the relevant factors and whether there has been a clear error of judgment." *Marsh v. Or. Natural Res. Council*, 490 U.S. 360, 378 (1989) (internal quotation marks and citation omitted). At a minimum, the agency must have considered relevant data and articulated an explanation establishing a "rational connection between the facts found and the choice made." *Bowen v. Am. Hosp. Ass'n*, 476 U.S. 610, 626 (1986) (internal quotation marks and citation omitted); *see also Pub. Citizen, Inc. v. FAA*, 988 F.2d 186, 197 (D.C. Cir. 1993) ("The requirement that agency action not be arbitrary or capricious includes a requirement that the agency adequately explain its result.").

> An agency action usually is arbitrary or capricious if:
>
> the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). As the Supreme Court has explained, "the scope of review under the 'arbitrary and capricious' standard is narrow and a court is not to substitute its judgment for that of the agency." *Id.* Rather, agency action is normally "entitled to a presumption of regularity." *Citizens to Pres. Overton Park, Inc. v. Volpe*, 401 U.S. 402, 415 (1971), *abrogated on other grounds by Califano v. Sanders*, 430 U.S. 99 (1977).

## C. Jurisdiction and Venue

The Court has federal question jurisdiction, *see* 28 U.S.C. § 1331, because this lawsuit arises under a federal statute. Venue is proper pursuant to 42 U.S.C. § 1395oo(f)(1) and 28 U.S.C. § 1391(e)(1).

# III. ANALYSIS

Distilled to its essence, this case presents the following question of administrative law: does the Medicare Act clearly require the Secretary to revise DRG weights that are, by themselves, entirely budget neutral or, instead, does the Act require budget neutrality in aggregate payments—including revised DRG weights—but leave the method of its achievement to the Secretary's decision?  Plaintiff Hospitals contend that the Secretary violated Medicare's budget neutrality requirement when she calculated reimbursements for SCHS beginning in Fiscal Year 2009 and for MDHs beginning in Fiscal Year 2010 because she applied a cumulative Budget Neutrality Adjustment to their *rates* and did not ensure that the recalibrated DRG *weights* were budget neutral.  The Secretary responds that the methodology she used to calculate hospital-specific rates for those years is based on a longstanding and reasoned interpretation of the Medicare statute.  Thus, the Court must determine whether the Secretary has provided a cogent explanation and whether her methodology accords with 42 U.S.C. § 1395ww(d)(4)(C)(iii) (directing that annual revisions to DRG weights must "be made in a manner that assures that the aggregate payments . . . for discharges in the fiscal year are not greater or less than those that would have been made for discharges in the year without such adjustment").

## A.  The Mathematical Arguments

Stated simply, Plaintiff Hospitals contend that the Secretary has "botche[d] the math."  Pls. Mot. for Summ. J. at 14.  They argue that her methodology "result[s] in payments to [Plaintiff] hospitals that are less than they should be," *id.*, because the Secretary applies her Budget Neutrality Adjustment to the hospital-specific payment *rate* rather than ensure that revised DRG *weights* are budget-neutral.  Plaintiff Hospitals complain that her methodology is

18

contrary to the statute's command that budget neutrality be achieved in the course of revising DRG weights each year.

Through their briefings and oral arguments, Plaintiffs have expounded upon their logic, which can be summarized with the following syllogism: (1) the statute requires annual adjustments to DRG weights but prohibits those adjustments from increasing or decreasing aggregate IPPS payments; (2) a Budget Neutrality Adjustment would not be necessary if adjusted DRG weights were budget neutral as required; (3) the fact that the Secretary applies a Budget Neutrality Adjustment, which invariably is less than 1.000, signals that adjusted DRG weights, on their own, would increase aggregate IPPS payments; therefore, (4) adjusted DRG weights are "artificially high" for purposes of 42 U.S.C. § 1395ww(d)(4)(C)(iii); and, finally, (5) use of "artificially high" DRG weights has had the effect of lowering the legitimate Medicare reimbursements that Plaintiff Hospitals otherwise would have received. *See* Pls. Mot. for Summ. J. at 15-16. Plaintiffs, therefore, do not challenge the Secretary's calculation of the Budget Neutrality Adjustment *per se*. Instead, they contend that the Secretary errs in not adjusting DRG weights so that no additional budget neutrality calculation need be made.

Plaintiff Hospitals' argument may be better understood in the context of the formula for the hospital-specific rate. The starting point for the hospital-specific rate is the average cost per patient discharged at a particular hospital in a particular base year. That average-cost figure is divided by the average DRG weight for the particular hospital in the same base year, and the quotient is multiplied by three numbers: (1) an update factor that reflects inflation; (2) the applicable Budget Neutrality Adjustment; and (3) the DRG weight specific to the diagnosis of the discharged patient for whom the hospital seeks Medicare reimbursement. Plaintiffs assert that the two DRG weights used in the calculation—the base year average DRG

weight, which is used as a divisor, and the DRG weight applicable to the discharged patient, which is used as a multiplier—are both too "artificially high" for purposes of 42 U.S.C. § 1395ww(d)(4)(C)(iii).  Because the Secretary only applies a Budget Neutrality Adjustment directly to the DRG weight used as a multiplier, Plaintiff Hospitals argue that she ignores the fact that the DRG weight used to calculate the average operating cost in the base year is also "artificially high."  If the Secretary applied the Budget Neutrality Adjustment directly to the base year DRG weight used as a divisor, that number would be smaller and the quotient of the average operating costs divided by the smaller, average DRG weight would be larger.  Plaintiffs contend that the result of the Secretary's methodology is a hospital-specific rate that produces a lower reimbursement payment than it otherwise would if the Budget Neutrality Adjustment were applied to all DRG weights in the formula.

The following hypothetical illustrates Plaintiff Hospitals' argument.  Recalling that the Budget Neutrality Adjustment invariably is less than 1.000, suppose the average operating per-patient cost in a base year is $1000.00, the average DRG weight for that base year is 2.000, the applicable Budget Neutrality Adjustment is 0.997, and the applicable DRG weight for the patient at discharge is 1.500.  As the Budget Neutrality Adjustment operates in the Secretary's calculation, (1000.00 / 2.000) * 0.997 * 1.500, Plaintiffs would receive a reimbursement of $747.75.  However, if the Budget Neutrality Adjustment were applied directly to the average base year DRG weight in the denominator *and* to the DRG weight used as a multiplier, the reimbursement would increase to $750.00.[17]

The Secretary counters that Plaintiff Hospitals' analysis is fundamentally flawed.  She argues that Plaintiffs err in assuming that the two DRG weights used in the hospital-specific

---

[17] This hypothetical purposefully omits the update factor for purposes of simplification.

formula (base year and year of discharge) are *equally* too high as they affect budget neutrality. The Secretary notes that Plaintiffs sometimes have argued that she need not apply a Budget Neutrality Adjustment to their hospital-specific rates *at all* because the extent to which the two DRG weights are "artificially high" for purposes of budget neutrality will "cancel[] out." *Id.* at 15. The Secretary concedes that this proposition is mathematically accurate, for the hospital-specific rate will produce the same reimbursement whether the Budget Neutrality Adjustment is applied to *both* DRG weights or to *neither*, *i.e.*, $750 (using the numbers from the prior hypothetical). But she contends that Plaintiffs leap to an unfounded conclusion from this mathematical foundation. The Secretary argues that the two DRG weights used in the hospital-specific rate are not of the same ilk. The average base year DRG weight represents the average of all DRG-weighted diagnoses for discharged patients *at the particular SCH or MDH in a particular base year*. In contrast, the DRG weight applicable to a single patient upon discharge represents the pre-set cost of treatment for that DRG in that year and is the same for *all* IPPS hospitals. Because individual DRG weights do not necessarily increase from year to year, Opp'n at 21-22 ("[S]ome DRG weighting factors may increase while others may decrease from one year to another due to the annual statutorily-required recalibration of these factors pursuant to 42 U.S.C. § 1395ww(d)(4)(C)(i) . . . ."), the Secretary contends that it cannot be said that the average DRG weight at a particular SCH or MDH in a base year is necessarily "too high" for purposes of budget neutrality by the same amount as the national DRG weight specific to a discharged patient years later, when the patient is discharged.

### B. The Statutory Arguments

Even if Plaintiff Hospitals' mathematical argument is flawed, the Secretary is obligated to present an affirmative case or rationale for why her calculations comply with the

relevant statutory provisions of the Medicare Act because the statutory language could appear to be clear, depending on its reading.[18]  Previously, she failed to do so.  She only declared that she is due deference from the courts when she is interpreting the Medicare Act because of its complexity but did not address, much less adequately explain, why she applies a Budget Neutrality Adjustment *after* instead of *in the process of* adjusting DRG weights each year, as the statute would appear to contemplate.  *See* 42 U.S.C. § 1395ww(d)(C)(4)(iii).  The Secretary has now provided a cogent rationale for her methodology.  *See Pub. Citizen*, 988 F.2d at 197.

   The Medicare Act requires the Secretary to "adjust the [DRG] classifications and weighting factors" annually to reflect changes in relative use of hospital resources, 42 U.S.C. § 1395ww(d)(4)(C)(i), and requires that "such adjustment . . . shall be made in a manner that assures that the aggregate payments under this subsection for discharges in the fiscal year are not greater or less than those that would have been made for discharges in the year without such adjustment."  42 U.S.C. § 1395ww(d)(4)(C)(iii).  The Secretary acknowledges that she "could, theoretically, apply the . . . [B]udget [N]eutrality [A]djustment to the DRG weights themselves," but contends that "the statutory language of § 1395ww(d)(4)(C)(iii) leaves it up to the Secretary

---

[18] Focusing on the express reference in 42 U.S.C. § 1395ww(d)(4)(C)(iii) to DRG weight adjustments, *see id.* ("The Secretary shall adjust . . . [DRGs] . . . at least annually . . . . [and] *[a]ny such adjustment* . . . shall be made in a manner that assures that the aggregate payments under this subsection . . . are not greater or less than those that would have been made for discharges in the year without such adjustment." (emphasis added)), Plaintiffs claim that "[t]he statutory text unambiguously calls for the Secretary to *adjust the DRG weights in a manner that is budget neutral*, not the rates," Pls. Resp. to Def. Supp. Brief [Dkt. 47] at 3 (emphasis in original).  Conversely, the Secretary emphasizes the statutory phrase "in a manner."  42 U.S.C. § 1395ww(d)(4)(C)(iii) ("The Secretary shall adjust . . . [DRGs] . . . at least annually . . . . [and] [a]ny such adjustment . . . *shall be made in a manner* that assures that the aggregate payments under this subsection . . . are not greater or less than those that would have been made for discharges in the year without such adjustment." (emphasis added)).  She argues that the statute "leaves it up to [her] to determine that manner in which she will ensure that the recalibration [of DRG weights] . . . has a budget neutral impact on aggregate IPPS payments."  Def. Supp. Brief at 6.

to determine the manner in which she will ensure that the recalibration pursuant to § 1395ww(d)(4)(C)(i) has a budget neutral impact on aggregate IPPS payments." Def. Suppl. Brief [Dkt. 46] at 6. Now that she has explained her statutory interpretation and history since its adoption, the Court agrees.

It is axiomatic that the Medicare Act is a complicated arena for which special deference is warranted. *See Cmty. Care Found. v. Thompson*, 318 F.3d 219, 225 (D.C. Cir. 2003) ("[T]he tremendous complexity of the Medicare program enhances the deference due [to] the Secretary's decision" (internal quotation marks and citation omitted)); *Methodist Hosp.*, 38 F.3d at 1229 (taking "special note of the tremendous complexity of the Medicare statute," and explaining that "courts must give heightened deference" to an agency's "interpretation of a complex and highly technical regulatory program such as Medicare" (internal quotation marks and citation omitted)). Section 1395ww(d)(4)(C)(iii) is but one of many Gordian knots that comprise the Medicare Act. It requires the Secretary to balance competing congressional mandates: annually recalibrate DRG weights (and wage rates) without increasing aggregate costs.

Plaintiff Hospitals and the Secretary disagree as to the proper reading of 42 U.S.C. § 1395ww(d)(4)(C)(iii). Plaintiffs contend that "[t]he statutory text unambiguously calls for the Secretary to *adjust the DRG weights in a manner that is budget neutral*, not the rates." Pls. Resp. to Def. Supp. Brief at 3 (emphasis in original). They accordingly contend that the statute only permits the Secretary to make adjustments to the DRG weights. The Secretary disagrees. She reads the statute as "leav[ing] it up to [her] to determine the *manner* in which she will ensure that the recalibration pursuant to § 1395ww(d)(4)(C)(i) has a budget neutral impact on aggregate IPPS payments." Def. Supp. Brief at 6 (emphasis added).

Upon examining the text of the statutory provision, its overall context, and the structure of the Medicare Act, the Court finds that 42 U.S.C. § 1395ww(d)(4)(C)(iii) is susceptible to more than one reading. *See Cnty. of L.A. v. Shalala*, 192 F.3d 1005, 1014 (D.C. Cir. 1999) ("Under *Chevron* step one, [courts] consider not only the language of the particular provision under scrutiny, but also the structure and context of the statutory scheme of which it is a part." (internal quotation marks and citation omitted)). It is possible to read the statute as a limitation on the Secretary's calculations (*i.e.*, Congress has directed the Secretary to adjust the DRG weights to be budget neutral), or as a deferral to the Secretary's expertise in administering Medicare (*i.e.*, the Secretary must annually recalibrate DRG weights without increasing aggregate costs but Congress has not dictated exactly how she is to do that).

The Secretary's solution to this statutory tangle is to apply a Budget Neutrality Adjustment after the hundreds of individual DRG weights have been recalibrated and normalized. That is, she fulfills the congressional directive that DRGs be updated annually by revising DRG weights based on their comparative drain on hospital resources rather than their impact on overall Medicare reimbursements. The revised DRG weights are "normalized" so that the "average" DRG weight remains the same year-to-year but it was obvious years ago that that such a correction is insufficient to achieve the mandated budget neutrality. To fulfill the statutory command that "adjustment[s] [to DRGs] . . . shall be made in a manner that assures that the aggregate payments under this subsection for discharges in the fiscal year are not greater or less than those that would have been made for discharges in the year without such adjustment," 42 U.S.C. § 1395ww(d)(4)(C)(iii), the Secretary applies a Budget Neutrality Adjustment to the federal and hospital-specific rate formulas.

The Court cannot say that the Secretary's explanation of why she decided, more than two decades ago, to apply a Budget Neutrality Adjustment at a particular place within the rate calculations is an arbitrary or capricious interpretation of 42 U.S.C. § 1395ww(d)(4)(C)(iii). The plain language of the statute does not require the Secretary to achieve budget neutrality in any particular order. So long as the revised DRG weights neither increase nor decrease *aggregate IPPS payments*, the requirements of the statute are met. *See Chevron*, 467 U.S. at 843 (explaining where statutory ambiguity exists, "the question for the court is whether the agency's answer [to that ambiguity] is based on a permissible construction of the statute"); *see also Cnty. of L.A.*, 192 F.3d at 1014.

Moreover, the manner in which the Secretary achieves budget neutrality comports with a policy decision she made long ago. Immediately after Congress adopted the budget neutrality mandate, the Secretary determined that the Budget Neutrality Adjustment that she applied to the standardized rate component of the federal rate would also apply to the hospital-specific rate. *See* 55 Fed. Reg. at 36074 ("To achieve budget neutrality, [the Secretary] applied this adjustment factor [(*i.e.*, the Budget Neutrality Adjustment)] not only to the standardized amounts, but also to the hospital-specific rates."). This was necessary, in the view of the Secretary, because the "aggregate payments" referenced in 42 U.S.C. § 1395ww(d)(4)(C)(iii) includes payments to SCHs and MDHs. If SCHs and MDHs were immune from budget neutrality, the Secretary "would have to apply a larger reduction factor to the standardized amounts," which "would be inequitable to those hospitals that are paid based on the [f]ederal rates." *Id.* at 36075. That the Secretary consistently has applied a cumulative Budget Neutrality Adjustment to the hospital-specific rate, without protest, is significant: "'an agency's burden of supplying a 'reasoned analysis' justifying its policy is lower where, as here, an agency is

continuing a long-standing policy compared to where the agency is suddenly changing that policy.'" *Shays v. FEC*, 511 F. Supp. 2d 19, 25 (D.D.C. 2007) (quoting *Bellevue Hosp. Center v. Leavitt*, 443 F.3d 163, 176 (2d Cir. 2006)).

Indeed, the fact that Plaintiff Hospitals only stumbled upon the Secretary's supposed math error after she rescinded the mistaken rebasing instructions further supports the Court's conclusion that 42 U.S.C. § 1395ww(d)(4)(C)(iii) is ambiguous and the Secretary's interpretation is reasonable. This is not to say that there is no corrective remedy for long-standing computational errors by an agency. *See Cape Cod*, 630 F.3d at 214-15 (explaining that an agency cannot continue to make erroneous computations once the agency is made aware of the miscalculation). But it is noteworthy that Plaintiff Hospitals did not challenge the initial application of the Budget Neutrality Adjustment to the hospital-specific rate when it was first adopted in Fiscal Year 1991 and raise the argument for the first time more than twenty years after the Secretary began applying a cumulative Budget Neutrality Adjustment to all Medicare reimbursement rates, including the hospital-specific rates. To be sure, Plaintiff Hospitals are not time-barred from bringing this suit. But where, as here, an agency has adopted a non-erroneous computation based on statutory language susceptible to more than one reading, the reasonableness of the agency's methodology is further supported by the fact that the agency's interpretation of the statute is long-standing and unchallenged.

Finally, the Court agrees that the Secretary's methodology ensures that all IPPS hospitals bear the brunt of budget neutrality. Eliminating a Budget Neutrality Adjustment from their hospital-specific rates, as Plaintiffs propose, would force reductions in reimbursements to all other IPPS hospitals to keep revisions to DRG weights budget neutral. As a result, SCHs would *always* be paid their hospital-specific rates and MDHs would *always* be paid 75% of their

hospital-specific rates, thereby rendering superfluous Congress's instructions that SCHs and MDHs be paid the higher of the federal rate *or* their hospital-specific rates.

Plaintiffs counter with the argument that "[a]lthough Congress'[s] enactment of base years calls for the hospital-specific rate to be based on 100 percent of the hospital's costs in that base year, the Secretary's approach artificially diminishes that calculation by an increasing amount over time." Pls. Resp. to Def. Supp. Brief at 14. They note that the Budget Neutrality Adjustment is steadily increasing each year, and estimate that on its current trajectory the Budget Neutrality Adjustment will cause a 6.1% reduction to the hospital-specific rates if, in the future, Congress selects 2026 as a base year, and a 17.4 percent reduction if 2093 is selected as a base year. Carrying their logic onward, they argue that the Secretary's methodology "[e]ventually . . . would reduce any subsequent base year rate enacted by Congress to zero, thereby effectively eliminating, by regulatory fiat, the SCH and MDH designations." *Id.*

The inherent speculation in such an argument undercuts any persuasive value it might have. Plaintiff Hospitals presume that the Medicare Act will not otherwise be amended between now and 2026 or 2093. Such an unlikely proposition does not lessen the deference owed to the Secretary's reasoned interpretation of an ambiguous statute nor render her reasonable action arbitrary and capricious. Modern life—to say nothing of coverage for medical care in the United States—is in a constant state of flux. The Court will not reject the Secretary's policy judgments from Fiscal Year 1991 on achieving budget neutrality while adjusting hundreds of DRG weights annually because that policy might have unintended consequences if nothing changes in the next one-hundred-odd years.

In any event, the Circuit's recent decision in the unrelated *Adirondack* case is particularly instructive. *Adirondack* determined that ambiguity concerning reimbursement

requirements under the Medicare Act reasonably permitted the Secretary to adjust downward hospital-specific rates pursuant to "her authority under § 1395ww(d)(5)(I)(i) to provide 'for such other exceptions and adjustments to [IPPS] payment amounts . . . as the Secretary deems appropriate.'" 740 F.3d at 700 (alteration in original) (quoting 42 U.S.C. § 1395ww(d)(5)(I)(i)). Logic dictates the same conclusion here.

In short, the Secretary has provided a reasoned explanation for her decision to apply cumulative Budget Neutrality Adjustments to Medicare reimbursements to SCHs beginning in Fiscal Years 2009 and 2010 and MDHs beginning in Fiscal Year 2010. *Chevron*, 467 U.S. at 842-43; *see also Mount Royal Joint Venture*, 477 F.3d at 754. In the face of ambiguous and competing statutory commands, the Secretary long-ago engaged in rulemaking and made a policy choice to apply the same budget neutrality requirements to Plaintiffs as to all other IPPS hospitals. Plaintiff Hospitals may have lately discovered that they disagree, but they have not shown the policy to be unworthy of deference, inadequately explained, or an unreasonable decision disconnected from the realities of hospital reimbursements under Medicare. *See Chevron*, 467 U.S. at 845; *Bowen*, 476 U.S. at 626; *Pub. Citizen*, 988 F.2d at 197 (D.C. Cir. 1993). If any approach could lead to unreasonable results, it may be the remedy Plaintiffs seek, as their resulting "gain [would] come[] at every other participating hospital's loss." *Adirondack*, 740 F.3d at 701.

**IV. CONCLUSION**

The Secretary's Motion for Summary Judgment, Dkt. 24, as supplemented, will be granted and Plaintiffs' Motion for Summary Judgment, Dkt. 22, as supplemented, will be denied.  Judgment will be entered in favor of the Secretary.  A memorializing Order accompanies this Opinion.

<table>
<tr><td></td><td>_____/s/_____</td></tr>
<tr><td></td><td>ROSEMARY M. COLLYER</td></tr>
<tr><td>Date: March 21, 2014</td><td>United States District Judge</td></tr>
</table>